**GREYHOUND LINES, INC., Plaintiff,**

v.

**Morton A. BENDER, Individually and d/b/a Michael Murray Associates, et al., Defendants.**

**Civ. A. No. 82–2049.**

United States District Court, District of Columbia.

July 31, 1984.

James A. Hourihan, David M. Gische, Hogan & Hartson, Washington, D.C., for plaintiff.

Leonard C. Greenebaum, David M. Dorsen, Sachs, Greenebaum & Tayler, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

This is an action by Greyhound Lines, Inc. ("Greyhound" or "GLI"), against Morton A. Bender ("Bender" or "MAB"), individually and doing business as Michael Murray Associates, Michael Murray, doing business as Michael Murray Associates, and Julian Scheer, doing business as Michael Murray Associates, for breach of contract and fraudulent misrepresentation. Greyhound seeks compensatory damages for breach of contract and fraudulent misrepresentation, restitution, and punitive damages for fraudulent misrepresentation. Defendants have asserted affirmative defenses and counterclaims for breach of contract, fraud in the inducement, and misrepresentation. Defendants seek rescission and reimbursement, as well as compensatory and punitive damages. Originally, both parties also sought specific performance but they withdrew these claims at the pretrial conference, shortly before trial.

In a thirteen-day trial to the Court, the Court heard testimony from the following witnesses: Armen Ervanian, Vice President of Real Estate at the Greyhound Corporation; Earl E. Shew, Executive Vice President for GLI until he retired, effective November 1982; John P. Kyle, a salesman for Coldwell Banker; John T. Nygren, Assistant General Counsel at the Greyhound Corporation; Susan Mann, an attorney in the Greyhound Corporation Law Department; Robert W. Wening, Jr., an architect in the firm of Mills, Clagett & Wening; Warren C. Marggraf, Vice President of the Architectural Engineering and Property Department at GLI; William T. Duncan, Senior Vice President for Real Estate at the American Security Bank; Frank L. Nageotte, Chief Executive Officer and President of Greyhound Corporation and Chairman of the Board of GLI; James B. Fagan, Director of Property in the Architectural Engineering and Property Department at GLI; William J. Hallinan, Executive Director of Taxes at Greyhound Corporation; Richard L. Patch of R.L. Patch, Inc., a construction cost engineer who estimates cost of construction; Marvin Stein, general contractor and President of Edmar Construction Company, Inc. ("Edmar"); William Benson, Vice President in charge of new construction at Edmar; Michael Murray, partner with Morton Bender and Julian Scheer in Michael Murray Associates who brought the principals in this transaction together; Victor Samuel Schneibolk of SB Construction Company; Donald Urquhart, real estate appraiser; Leon Weiner, builder and developer; Richard H. Rubin, real estate developer; and Morton Bender, developer and general contractor.

Deposition testimony also was introduced of the following individuals: F. Edward Lake, Vice President and Treasurer of Greyhound Corporation; James Mizes, Financial Analyst at Greyhound Corporation; Richard C. Stephan, Vice President and Controller at Greyhound Corporation; Bruce Thomas, Vice President of Greyhound Corporation; William F. Tritton, Vice President and Controller at GLI;

Frederick P. Dunikoski, President and Chief Operation Officer of GLI; Robert O. Lowe, Vice President and Assistant Controller at Greyhound Corporation; John G. Keller, Director of Tax Administration and Planning at Greyhound Corporation; Carroll Bumpers, Vice President and Financial Advisor to the Chief Executive Officer of the Greyhound Corporation; as well as Susan Mann; Armen Ervanian; and James B. Fagan.

## FINDINGS OF FACT

Plaintiff GLI is a subsidiary of the Greyhound Corporation. It is a corporation organized under the laws of the State of California and has its principal place of business in Phoenix, Arizona.

Defendant Bender is a resident of the District of Columbia and a citizen of the United States. Defendant Michael Murray ("Murray") is a resident of the State of Maryland and a citizen of the United States. Defendant Julian Scheer ("Scheer") is a resident of the Commonwealth of Virginia and is a citizen of the United States. All three defendants transact business in the District of Columbia. Michael Murray Associates is a general partnership organized and doing business in the District of Columbia. Mr. Bender holds a ninety percent interest in Michael Murray Associates and defendants Murray and Scheer each hold a five percent interest in the partnership.

Greyhound currently owns and operates a bus terminal at 1110 New York Avenue, N.W., Washington, D.C. ("the old terminal"). The value of this property had been rising for a number of years as a result of an increased demand for office space, as well as the proposed construction of the D.C. Convention Center across the street. To take advantage of the increase in real estate values, Greyhound decided to sell the old terminal and build a modern facility. During 1980 and early 1981, Greyhound looked at possible sites for the new terminal.

On February 5, 1981, the Greyhound Corporation approved "Project Concept 81–5" which authorized, *inter alia*, the expenditure of $75,000 to obtain an option to purchase land at 90 K Street, N.E., near Union Station in Washington, D.C., at a price of $8,310,240. Armen Ervanian, Vice President for Real Estate at the Greyhound Corporation, suggested that this project concept be approved. He handles real estate matters for all of the subsidiary companies of Greyhound Corporation, including GLI, and was the Greyhound official who was in charge of the new terminal project.

On February 17, 1981, Greyhound purchased an option for this land which would be the site of Greyhound's new terminal ("the new terminal site"). The option was to expire on June 17, 1981.

As contemplated by Greyhound, a developer would purchase this property, pursuant to the option Greyhound had obtained, and would build a new terminal to Greyhound's specifications. In a "tax-free exchange," Greyhound would then trade the old terminal to the developer in exchange for the new terminal property and cash representing any difference between the value of the old terminal and the cost of developing the new terminal.

In January 1981, defendant Murray learned that Mr. Bender was interested in purchasing the old terminal property on New York Avenue. He told Mr. Ervanian about Mr. Bender's interest and Mr. Ervanian asked that Mr. Bender write to him. On January 26, 1981, Mr. Bender wrote to Mr. Ervanian expressing his interest in this property. On March 4, 1981, they met and discussed Greyhound's proposal for a tax-free exchange, the price of the old terminal and development of the new terminal site.

Between March 4, 1981, and March 30, 1981, the parties negotiated the price at which the old and new properties would be exchanged. The parties eventually agreed to a price of $21 million, or about $650 per square foot, for the old terminal property.

On April 2, 1981, Mr. Ervanian sent a draft of the proposed exchange agreement to Mr. Bender. On April 16 and 17, 1981, Mr. Bender met in Phoenix, Arizona, with

Mr. Ervanian and other members of the Greyhound staff. At this time, Mr. Ervanian informed Mr. Bender that a completed agreement had to be signed by April 17, 1981, to enable Mr. Ervanian to submit the contract to Greyhound Corporation's Board of Directors for approval before the option to buy the new terminal property expired.

On April 17, 1981, Greyhound and Mr. Bender executed the "Greyhound-Bender Agreement for Exchange of Real Properties" (the "Exchange Agreement"). *See* Appendix A attached hereto.

Under the terms of the Exchange Agreement, Greyhound assigned to Mr. Bender the option it held to purchase the tract of land located at 90 K Street, N.E., in the District of Columbia, for the sum of $8,310,240. Exchange Agreement, ¶¶ 1.03, 2.1, 3.1. Bender agreed to exercise the option, purchase the K Street property, and construct upon it a new bus terminal.

On or about October 14, 1981, Mr. Bender was to submit to Greyhound for its review and approval or disapproval, final plans and specifications prepared by the architectural firm of Mills, Clagett & Wening, A.I.A. [American Institute of Architects]. *Id.* at ¶ 5.1. Greyhound then had twenty days to approve or disapprove the plans and specifications. *Id.* at ¶ 5.2. If Greyhound failed to do either, it would be deemed to have approved the plans and specifications. *Id.* Within 120 days of Greyhound's approval, Mr. Bender was to submit the "Construction Documents" to Greyhound for its review and approval or disapproval, including the total guaranteed project budget, a "guaranteed cost" construction contract, a performance and payment bond, documents evidencing specified insurance coverage, and an architect's contract. *Id.* at ¶ 5.3. Upon Greyhound's approval of these Construction Documents, Mr. Bender was to obtain the requisite building permits, variances, or similar authorizations, and complete construction of the terminal within eighteen months from the issuance of the building permits. *Id.* at ¶ 5.4. The estimated cost of construction

of the terminal building was $3,400,000. *Id.* at ¶ 5.1.

Upon completion of the new terminal, Mr. Bender was to exchange the new terminal for Greyhound's existing terminal located at New York Avenue and 11th Street, N.W., in the District of Columbia. The exchange price of the old terminal site was to be $21 million, and the exchange price of the new terminal site acquired by Mr. Bender ("the Bender property") was to be the sum of the actual purchase price of $8,310,240 paid by Mr. Bender, less GLI's option cost plus the actual direct costs and expenses paid by Mr. Bender in connection with the acquisition, development, and exchange of the Bender property. *Id.* at ¶ 7.1. Mr. Bender agreed to maintain accurate books and records sufficient to substantiate such costs and expenses. *Id.* The agreement further provided:

> If the exchange price of the GLI Property [old terminal] is less than the exchange price of the MAB Property [new terminal], GLI shall pay the difference between the two exchange prices to MAB on the day of closing.... If the exchange price of the MAB Property is less than the exchange price of the GLI Property, MAB shall pay the difference between the two exchange prices to GLI on the Closing.

*Id.* *See also id.* at ¶ 13.1 ("[A]ny difference in the exchange price of the [Bender] Property and the GLI Property shall be paid by the applicable party.")

For the Exchange Agreement to be effective, approval by Greyhound's Board of Directors was needed by May 13, 1981. Greyhound had a formal in-house procedure for the approval of capital expenditures such as were contemplated by the Exchange Agreement. A formal "Investment Proposal", defining the scope and financial consideration of the proposed transaction, had to be submitted to the Greyhound "Investment Committee" which would then review it and make recommendations for approval or disapproval to the Board of Directors.

On April 17, 1981, the same day the Exchange Agreement was signed by Frank Nageotte, Chief Executive Officer and President of Greyhound Corporation and Chairman of the Board of GLI, and Mr. Bender, Mr. Ervanian gave Mr. Nageotte a memorandum requesting authorization to enter into the Exchange Agreement. *See* Defendants' Exhibit 59 (beginning at 14th page of Exhibit).

This memorandum requested authorization to enter into a tax-free exchange agreement with Mr. Bender, "generally in accordance with the following terms:"

1. Morton Bender (MB) will build a new terminal to GLI's specifications on the 103,878 sq.ft. parcel [at 90 K St., N.E.]....

2. The total cost of the new facility should not exceed $16 million....

3. Upon its completion, MB will exchange the new terminal for the existing GLI terminal ... containing 32,788 sq.ft. for a value of $21 million or $640.48/sq.ft.

4. Upon completion of the exchange transaction, GLI will receive the $5 million "boot" difference from MB in cash....

*Id.* Mr. Ervanian also indicated that "full cooperation will be extended to MB in an effort to have him complete the exchange facility in less than two years and for less than the *$16 million maximum figure.*" *Id.* at 16th page of Exhibit (emphasis added). The Court notes that contrary to Mr. Ervanian's representations in this memorandum to Mr. Nageotte, the Exchange Agreement does not indicate that "[t]he total cost of the new facility should not exceed $16 million" or that GLI would "receive the $5 million 'boot difference' from MB in cash" when the transaction was completed. *Id.* at 14th page of Exhibit.

An Investment Proposal to enter into the tax-free exchange agreement with Mr. Bender was then submitted on April 24, 1981. It states in pertinent part:

The difference between the proposed exchange facility and land cost estimated to be $16 million and the $21 million sale price, or approximately $5 million depending on an actual final cost of exchange facility, will be paid to Greyhound Lines, Inc. in the form of a cash "boot".

\* \* \* \* \* \*

Authorization is also requested to consider receiving the estimated $5 million cash "boot" over a three year period on an installment basis at an interest rate equal to the interim financing rate charged on development of the exchange facility, provided the note is satisfactorily secured.

*Id.* at 9th page of Exhibit.

The Investment Committee recommended approval of the Investment Proposal on May 1, 1981. *Id.* at 5th page of Exhibit. Greyhound's Board of Directors approved the agreement on May 12, 1981. The Court notes that if the actual cost of the project exceeded the Investment Proposal estimate by more than ten percent, approval of the increased cost would have to be sought from the Board of Directors. Mr. Bender was not aware of this corporate policy nor was he aware of the estimates quoted in the Investment Proposal. Mr. Bender was informed in a letter from Mr. Ervanian, dated May 12, 1981, that the Exchange Agreement had been approved by the Board. Defendants' Exhibit 55.

After the Exchange Agreement was signed, Mr. Bender assigned his rights under the Exchange Agreement to Michael Murray Associates. *See* discussion *supra* p. 1212. On June 15, 1981, Greyhound approved assignment and delegation of Mr. Bender's rights and duties under the Exchange Agreement to Michael Murray Associates. Defendants' Exhibit 69.

In April 1981, at Greyhound's direction, Mr. Bender hired the architectural firm of Mills, Clagett & Wening to begin preparation of the construction plans and specifications for the new terminal. Greyhound had already interviewed Robert Wening of that firm and told Mr. Bender that it wanted Mr. Wening to be retained as the architect on the project. Messrs. Bender and Wen-

ing agreed upon a fee of $210,000 for all architectural and engineering services that were to be performed pursuant to the Exchange Agreement. *See* Plaintiff's Exhibit 176.[1]

In May 1981, Mr. Bender spoke to W. Thomas Duncan of the American Security Bank to arrange financing for the development of the new terminal. He submitted to the bank an estimated development budget of $21 million. On June 15, 1981, Mr. Bender executed a promissory note to the American Security Bank for a $10 million loan, which was enough to cover his purchase of the new terminal property at K Street, as well as the architects' costs and carrying charges. The promissory note provided that Mr. Bender would pay interest at the rate of two percentage points above the prime rate.[2]

On June 15, 1981, Mr. Bender exercised the option which had been assigned to him by GLI and, in accordance with the Exchange Agreement, bought the land for the new terminal, at a price of $8,310,240.

Shortly after Mr. Wening and his firm were retained, they began to work closely with Greyhound's architects assigned to this project, Warren C. Marggraf and James B. Fagan. During the next seven months, numerous and substantial changes to the design and specifications for the new terminal were made, at the request of Greyhound. *See* Defendants' Exhibit 104. These changes included increasing the width of the waiting area by ten feet, relocating the restaurant/gift shop, the HVAC [heating, ventilation, and air conditioning] units, dump zones, and stairs to the mezzanine, increasing the number of ticket booths, enlarging the terminal manager's office, reducing the size of the operations office, and providing a sound insulated wall between the drivers' room and the office and locker areas. *Id.*

Preliminary drawings and specifications were sent to Greyhound on November 11, 1981. Defendants' Exhibit 106. Final drawings, specifications, and proposed letters to bidders were sent to Greyhound on December 7, 1981. *Id.* These documents were received by GLI on or about December 9, 1981. The bid letter indicated that the bids would be opened in private and that a bid bond in the amount of five percent of the base bid was required. The letter also indicated that the owner, *i.e.*, Mr. Bender, reserved the right not only to waive irregularities in bids and bidding but also to reject any or all bids. *Id.* Mr. Bender reserved the right to waive irregularities such as a bidder's failure to fill out the bid form completely. An Addendum to Specifications and Drawings was sent to GLI on December 21, 1981. Defendants' Exhibit 113A. A Second Addendum was dated January 5, 1982, and received by GLI on January 11, 1982. Defendants' Exhibit 114.

The Second Addendum contained the following liquidated damages clause:

> The Owner will suffer financial loss if the Project is not Substantially Completed within the time specified on the Bid Form. The Contractor (the Contractor's Surety) shall be liable for and pay to the Owner the sums hereinafter stipulated and fixed, agreed and liquidated damages for each calendar day of delay until the Work is Substantially Completed: Fifteen Thousand Dollars ($15,000.00).

*Id.* at Addendum to Specifications. The Exchange Agreement called for completion of construction within eighteen months of issuance of the building permit. Exchange Agreement, ¶ 5.4. The amount of the liquidated damages was equal to Mr. Bender's

---

1. This fee was later increased to $310,000 because Mr. Wening had to perform additional services that he had not contemplated when he entered into the initial fee agreement with Mr. Bender. *See* Plaintiff's Exhibits 61, 92.

2. In January 1982, Mr. Bender executed a promissory note to the American Security Bank, which replaced the note of June 15, 1981. At Mr. Bender's request, the new note provided that he would pay interest at the rate of two percentage points above the prime rate, with a minimum rate of sixteen percent. He also requested that the new note be back-dated to June 15, 1981. *See* Plaintiff's Exhibits 42, 135.

projected interest carrying costs, per day, on the project.

All of the drawings, specifications, and addenda were received without comment by Greyhound. Therefore, pursuant to paragraph 5.2 of the Exchange Agreement, the plans and specifications were deemed approved by Greyhound on or about December 29, 1981, *i.e.,* twenty days after Greyhound received the plans and specifications. Exchange Agreement, ¶ 5.2. The plans and specifications, as amended, were let out for bids in late December 1981 and early January 1982. Bids were due on January 12, 1982.

Messrs. Bender and Wening had selected eight contractors as potential bidders on this project. *See* Plaintiff's Exhibit 223. Of these eight, only two submitted bids, S.B. Construction Company and Edmar. Mr. Wening testified that after the second addendum was issued, which included the $15,000 per day liquidated damages clause, most of the bidders lost interest in bidding on the Greyhound project. Mr. Wening also testified that this liquidated damages clause was very high. Before the close of the bid on January 12, 1982, Mr. Wening told Mr. Bender that many of the bidders had decided not to bid on the project. Mr. Bender indicated, however, that receipt of two or three bids on the project would be enough.

On January 12, 1982, Mr. Bender opened the bids privately. Edmar's bid of $5,990,-000 was the lowest. S.B. Construction Company submitted a bid of $6,015,000. Defendants' Exhibit 116. Although the specifications required that bids be accompanied by a bid bond, Edmar failed to provide one. Marvin Stein, President of Edmar, testified that he never applied for a performance bond on the Greyhound project because Greyhound had not approved the contract. The Court notes that

S.B. Construction Company's bid does contain a bid bond. *Id.*[3]

During the week following January 12, 1982, Mr. Bender notified Messrs. Marggraf and Ervanian that Edmar was the successful bidder and that the amount of the bid was $5,990,000. When he informed them of the amounts of the bids, neither had any noticeable reaction. A few weeks later, however, in February 1982, Mr. Ervanian did voice an objection, indicating that he thought the bids were too high by about $1 million.

On February 18, 1982, Mr. Wening applied for a building permit which was expected to take from three to six months to issue. *See* Defendants' Exhibit 184.

On March 1, 1982, Greyhound officials met to discuss alternatives to Greyhound's performing the Exchange Agreement. This meeting is significant because it took place before Greyhound had even received Mr. Bender's preliminary development budget of $26.4 million, which was sent on March 8, 1982. *See* Defendants' Exhibit 137.

Although Mr. Ervanian denied that there was a meeting on March 1, 1982, and Mr. Fagan "just [drew] a blank" as to whether there was a meeting, after examining all of the evidence in this case, the Court finds than an internal Greyhound meeting did take place on March 1, 1982.

Most significantly, Mr. Marggraf admitted that he attended a meeting with Mr. Ervanian on March 1, 1982. During the trial, the following colloquy occurred between Mr. Marggraf and plaintiff's counsel:

Q: Mr. Marggraf, after the bid price was made known to you, do you recall whether you had any discussions at Greyhound with respect to rebidding the project?

---

**3.** The Court is unable to cite to the Edmar bid because all of the copies were either lost or destroyed prior to trial. Mr. Stein testified that when he learned of the instant litigation, he threw away all of his records pertaining to this bid, including the names of contractors, suppli-

ers, and materialmen Edmar expected to use, as well as all of the plans and specifications. Mr. Bender testified that he could not find the Edmar bid form and that he probably threw it away because he did not need it after the construction contract with Edmar was signed.

A: Yes, I had a meeting with Mr. Ervanian and I believe Mr. Fagan was present and we ...

Q (by Court): When was this, if you can tell us?

A: It was March 1, as I recall.

Trial Transcript at pp. 19–20 (Nov. 8, 1983).

Moreover, Mr. Fagan took notes of a meeting dated March 1, 1982. These notes list the names "E.E. Shew, W. Tritton, WCM, Debra, Jack, J.F., Ervanian, Jack, and Bill Hallinan." Defendants' Exhibits 128, 128A. "E.E. Shew" refers to Earl E. Shew, Executive Vice President for GLI at that time. "W. Tritton" refers to William F. Tritton, Vice President and Controller at GLI. "WCM" refers to Warren C. Marggraf, Mr. Fagan's superior, who admitted that he attended this meeting on March 1, 1982. "Debra" refers to Debra Livermore, an assistant in Greyhound Corporation's real estate department. The two "Jacks" refer to the only two persons named "Jack" who were working on the project, Jack Nygren, a Greyhound Corporation lawyer, and Jack Keller, a Greyhound Corporation tax accountant. "J.F." refers to Mr. Fagan and "Bill Hallinan" refers to William J. Hallinan, a tax attorney and Executive Director of Taxes at Greyhound Corporation.

Although Mr. Fagan did not deny that these notes were his or that they were dated March 1, 1982, he did deny any recollection of this meeting. This lack of recollection is in sharp contrast to Mr. Fagan's ability to recall the March 10, 17, and 31, 1982 meetings.

Three of the individuals listed in Mr. Fagan's notes also have notes dated either March 1, 1982, or bearing computations identical to those in Mr. Fagan's notes. Mr. Marggraf identified his notes which are dated "3/1/82" and contain the same figures which appear in Mr. Fagan's March 1, 1982 notes.

At his deposition, Mr. Keller also identified his notes. Although these notes are undated, they contain the same computations as those of Messrs. Fagan and Marggraf. Defendants' Exhibit 270c. Mr. Kel-ler, however, was unable to recall anything about the March 1, 1982 meeting or even that it took place.

Finally, Mr. Hallinan also has a set of notes dated March 1, 1982. Defendants' Exhibits 284, 285. Although Mr. Hallinan does not recall the meeting, he did recall attending a meeting where "undoing the deal" was discussed. His notes of March 1, 1982, clearly state that "Armen [Ervanian] is thinking about 'undoing' exchange contract." Defendants' Exhibit 284. Moreover, Mr. Hallinan admitted that, although he was not completely sure of the dates of the meetings he attended in early March 1982, he was sure that Mr. Marggraf was at the meetings he attended. As indicated above, Mr. Marggraf attended the meeting on March 1, 1982, but did not attend the meeting on March 10, 1982. Mr. Fagan attended the March 10, 1982 meeting in place of Mr. Marggraf.

Throughout his testimony, Mr. Ervanian denied that a meeting took place on March 1, 1982, and denied that a meeting took place before March 10, 1982. On March 10, 1982, however, prior to the meeting concerning this project, he sent a confidential memo to the following six individuals, all of whom were listed in Mr. Fagan's March 1, 1982 notes as attending the March 1, 1982 meeting: W.J. Hallinan; W.C. Marggraf; J.T. Nygren: E.E. Shew; R.C. Stephan; and W.F. Tritton. Defendants' Exhibit 144. The memo states in pertinent part:

*In accordance with our recent meeting on the subject of Washington, D.C.,* Morton Bender will be in here on Thursday afternoon, March 11th, and Friday as well.

\* \* \* \* \* \*

Between the bid, architect fees and demolition being $2.4 million over the IP [Investment Proposal] amount and "soft costs" mounting very rapidly, I would like to suggest that we promptly undertake an analysis to consider the effects of Greyhound Lines doing a taxable transaction vs. a tax-free exchange,

which would require "undoing" the exchange agreement.

*Id.* (emphasis added).

When asked at trial what "recent meeting" he was referring to in his memo, Mr. Ervanian stated that, "I was wrong, there was no 'recent meeting'." The Court does not find this response credible.

Moreover, in contrast to Mr. Ervanian, Mr. Stephan, Vice President and Controller of Greyhound Corporation, testified at his deposition[4] that he was sure that there were two meetings in early March 1982. Deposition of Richard Stephan at 33.

Mr. Marggraf's testimony, the notes of Messrs. Fagan, Marggraf, Keller, and Hallinan, Mr. Stephan's deposition testimony, and Mr. Ervanian's confidential memo of March 10, 1982, referring to a "recent meeting" about the Washington, D.C. project, confirm to the Court that a meeting did take place on March 1, 1982.

It was at this meeting that Greyhound first began seriously to consider "undoing" the Exchange Agreement, and, instead, began to consider doing the project itself. *See* Defendants' Exhibits 128, 128A, 284. As of mid-January 1982, Greyhound knew that the low construction bid was $5.9 million. In his confidential March 10, 1982 memo, Mr. Ervanian also indicated that:

> With the November, 1981 change in tax laws allowing 15-year straight line depreciation and the likelihood of excess tax credits against a potentially large capital gain in the event of a taxable transaction, *we may be better served to do the project ourselves.* This would also permit Greyhound Lines to consider rebidding the project or entering into a negotiated price contract in view of the $5,990,-000 low bid.

Defendants' Exhibit 144 (emphasis added).

The fact that Greyhound was seriously considering "undoing" the agreement also is reinforced by Mr. Wening's testimony

that, on March 3, 1982, Mr. Marggraf called and inquired about the contract being rebid, with Greyhound as owner.

Meanwhile, on March 1, 1982, in Washington, D.C., Mr. Bender signed a construction contract with Edmar, the lower bidder, without first obtaining approval from GLI. Plaintiff's Exhibit 234; *see* Exchange Agreement, ¶ 5.3(b) ("The General Contractor must be acceptable to GLI."). Mr. Wening testified that the construction contract was prepared in his office on or about March 1, 1982. His recollection was that "we were getting very close to the termination of the bid guarantee period, so it was done to beat that deadline." Trial Transcript at p. 53 (Nov. 7, 1983). After his office prepared the construction contract, copies were sent to Mr. Bender. *Id.* at p. 54.

On March 8, 1982, Mr. Bender sent Greyhound "preliminary budget figures for the new Greyhound facility" in the amount of $26,440,000. Defendants' Exhibit 137. Greyhound received this budget on March 9 or 10, 1982. It contained the costs of the land, financing, taxes, demolition, borings, permits, construction of the building and related costs, as well as a $1,000,000 "construction fee" for Mr. Bender. *Id.*

Upon receipt of Mr. Bender's budget, another internal Greyhound meeting was held on March 10, 1982. Those present included Messrs. Ervanian, Stephan, Nygren, Hallinan, Keller, Tritton, Shew, and Fagan, who attended in place of Mr. Marggraf. Defendants' Exhibit 142.[5] Mr. Ervanian's notes of this meeting indicate that:

1. Consensus was that with current excess tax credits, "undoing the exchange" and handling as a GLI construction project (taxable) was still probably more economical than the exchange.

2. Their [sic] were many items on the Budget that Greyhound would not

---

**4.** Mr. Stephan's deposition was read into the record at trial.

**5.** Although Mr. Ervanian's notes of this meeting list Mr. Marggraf, presumably as attending, Mr.

Marggraf indicated that although he received a copy of Mr. Ervanian's confidential memo of March 10, 1982, he did not attend this meeting.

incur, or would be less, if we were going direct; i.e., higher interest rates + points, insurance title costs + transfer taxes.

*Id.*

This consensus was reiterated in notes taken of the same meeting by Mr. Fagan:

Meeting 3/10/82

Washington, D.C.

*Consensus of opinion!*

If we can *undue* [sic] *Bender Deal &* Settle w/ him we would be better off to Do Project ourselves! (*undue Exchange)

*Clout:* We own the property that he wants.

Defendants' Exhibit 146 (emphasis in original).

On March 11–12, 1982, Mr. Bender met in Phoenix with Greyhound to discuss the preliminary budget. During these meetings, Mr. Bender advised Greyhound that he had signed a construction contract with Edmar.

In the afternoon of March 11, 1982, Mr. Bender met with Messrs. Ervanian and Nygren and other Greyhound officials. Messrs. Ervanian and Nygren questioned Mr. Bender's inclusion of a $1 million construction fee but otherwise appeared to accept Mr. Bender's explanations of specific items on the preliminary budget, although they did indicate that they thought the total budget price was too high.

When they met again on March 12, 1982, Mr. Ervanian informed Mr. Bender that Greyhound had decided that it would be better if they "undid" or "restructured" the "deal" because Greyhound had determined that it could build the new terminal more cheaply than Mr. Bender, even without the benefits of a tax-free exchange.

As part of this "restructuring," Mr. Ervanian wanted Mr. Bender to pay $21 million to Greyhound for the old terminal. Greyhound would then take over development of the new terminal.

Messrs. Ervanian and Nygren told Mr. Bender that Greyhound could not approve

his proposed budget because the construction cost component exceeded the $3.4 million "estimate" in the Exchange Agreement. Although Messrs. Ervanian and Nygren continued to rely on this $3.4 million estimate, at trial Mr. Marggraf indicated that when the new terminal project went out for bids, he estimated that the bid price would be $4.5 million. Moreover, Mr. Wening's "guesstimate" on the bid price as of December 1981 was $4.7 to $5.1 million.

Messrs. Ervanian and Nygren also told Mr. Bender that his proposed budget could not be approved because the budget lacked certain "back-up" documentation, and Mr. Bender had signed a contract with Edmar, without first seeking Greyhound's approval.

Mr. Bender told Greyhound he could not agree to a restructuring of the deal in this manner because Greyhound was "letting itself off the hook." Under the proposed restructuring, Mr. Bender would not be allowed to develop the new terminal site but would still be held to the obligation in the Exchange Agreement to purchase the old terminal property for $21 million; Greyhound then could develop the project itself.

After March 11, 1982, Greyhound continued to propose various ways to "restructure" the agreement but all of them required that Mr. Bender pay Greyhound $21 million for the old terminal. At trial, Mr. Ervanian was asked specifically whether every proposal he made to Mr. Bender since March 1982 contemplated holding firm to the $21 million price for the old terminal, except to the extent he was willing to discount it for early payment, and having Greyhound take over the project rather than continuing to have Mr. Bender build the new terminal. He indicated that he believed that was substantially correct. Trial Transcript at p. 20 (Nov. 1, 1983). F. Edward Lake, Vice President and Treasurer of Greyhound Corporation, also indicated that all of Greyhound's proposals contemplated abrogation of the Exchange Agreement.[6]

---

6. Relevant portions of Mr. Lake's deposition were read into the record at trial.

Although Mr. Ervanian testified that he had determined that Mr. Bender would not develop and build the new Greyhound bus terminal as of March 11, 1982, he continued to insist that Mr. Bender provide further "back-up" material for his projected budget.

Greyhound officials went to Washington, D.C., on March 17 and 31, 1982, to meet with Mr. Wening and officials of Edmar in order to review the Edmar construction contract. On March 17, 1982, Messrs. Fagan and Wening met with William Benson, Vice President in charge of new construction at Edmar, and the individual who actually prepared the bid for the Greyhound terminal project. Mr. Benson discussed each item of the bid with Mr. Fagan and Mr. Fagan took notes indicating possible savings that could be made on the Edmar bid. Defendants' Exhibit 155. At the end of the meeting, Mr. Fagan asked Mr. Benson to compile a list of items on the contract that could be reduced in price.

On March 22, 1982, Mr. Shew wrote to Mr. Bender confirming a meeting to be held in Washington, D.C., during the week of March 29, 1982:

> to discuss the unacceptable high bid price of the new terminal and amicably resolve how to reduce it or make other arrangements.... With respect to the tentative, pro forma cost estimate and other papers received from you, in order that there shall be no misunderstanding, this is to advise that Greyhound Lines does not deem them your submission of Construction Documents; and, therefore, no approval nor disapproval is given nor required by Greyhound Lines.

Plaintiff's Exhibit 335.

Mr. Bender responded to this letter on March 30, 1982, setting up a meeting with Greyhound officials on March 31, 1982. His letter stated in pertinent part:

> With regard to the preliminary submission of construction documents which the writer furnished to Mr. Ervanian, it was just what it indicated—preliminary. We knew that the figures therein would vary from what was indicated. As was point-ed out to Mr. Ervanian by the writer, the figures contained in our submission were in several instances too low. The purpose of the meeting was to give both your firm and ours an opportunity to review them together so that a proper budget could be agreed to.
>
> In conclusion, we would like to remind you that the "estimate" for the construction contained in our agreement was just that an "estimate" suggested by your representatives and not a figure that we agreed with. The size of the project, if you will review your records, incrased [sic] by 20% in physical dimensions, and the quality of the design was indicated by your firm to be nothing but first class. If as a result of our following your instructions and directions the construction figures are unacceptable and beyond that which you put into our agreement, then you have no one to blame but yourselves.
>
> We would further point out that the prices we received for construction were made known to your firm at the time we received them. Though various people from your firm expressed surprise to the writer about the figures, no one indicated that they were unacceptable. In fact in discussions with your representatives, they indicated that they did not want to downgrade any of the design to save any money.

Plaintiffs' Exhibit 337.

At the meeting on March 31, 1982, Edmar suggested that the construction costs could be reduced by approximately $300,-000 if Greyhound would accept the substitution of alternate but "equal" construction materials rather than use those materials originally specified. Greyhound rejected this suggestion. At the conclusion of the March 31, 1982 meeting, Mr. Fagan's contemporaneous notes indicate that Mr. Shew, Executive Vice President at GLI, told "Morton Bender to hold at this [p]oint in time[;]" *i.e.,* Mr. Bender was not to do anything further. Defendants' Exhibit 165.

As a result, Mr. Bender did not submit to Greyhound the Construction Documents that were called for under paragraph 5.3 of the Exchange Agreement. These documents would have been due on April 29, 1982, *i.e.*, 120 days from the December 29, 1981 approval date of the plans and specifications. Exchange Agreement, ¶ 5.3.

During a telephone conversation in May 1982, Mr. Nygren admittedly told Mr. Bender that Greyhound would probably not approve any budget he submitted if it exceeded $17 million.

Mr. Ervanian also admitted that the original Investment Proposal contained a mathematical error of approximately $1.5 million in the calculation of the projected interest expense on the new terminal project.

Despite the fact that Mr. Bender had been told to "hold" as of March 31, 1982, on June 28, 1982, Greyhound sent a letter to Michael Murray Associates, c/o Mr. Bender, charging that Mr. Bender was in material breach or anticipatory breach of the Exchange Agreement on the following grounds:

1. Bender has not furnished all the required Construction Documents in accordance with the terms of Section 5.3;

2. Bender has entered into a construction contract without the approval of Greyhound Lines, Inc. which is a violation of Section 5.3;

3. Bender has not furnished a Budget which GLI can approve.

Defendants' Exhibit 217. The letter also stated that:

> GLI further advises that it shall hold Bender liable for all damages GLI suffers or has suffered as a result of such breaches of the Exchange Agreement.
>
> The Exchange Agreement was made because GLI desired to have a new terminal in Washington, D.C., on the new "K" Street site ... and desired not to have more than $17 million invested in that facility at the conclusion of the project.

*Id.*

Also, on June 28, 1982, an in-house confidential memorandum was sent from Mr. Ervanian to Mr. Nageotte and L.G. Lemon, an attorney and Greyhound official, requesting that the original Investment Proposal be modified. The memorandum stated in pertinent part:

### CURRENT MARKET AND VALUE OF OLD TERMINAL

In discussions with both MB and the bank, it is obvious that the underlying reason for the problem in trying to restructure a "workout" of this matter is the drastic decline in the office leasing market and downtown land values in Washington, D.C.

When I completed negotiations with MB in April, 1981, our old terminal property had been appraised by a Washington, D.C. MAI appraiser, only 2 months earlier, at $15,330,000 or $467.50 per sq. ft. At our negotiated price of $21 million or $640 per sq.ft., it was reportedly a record price. I have recently made inquiries through the Washington, D.C. office of Coldwell Banker on current land values and their opinion is that our old terminal has a current maximum value of $500 per sq.ft. or $16.4 million for our 32,788 sq.ft. parcel. MB's bank is very concerned over their outstanding loan balance of $11 million based on their opinion that its value is only $365 per sq.ft. or $12 million.

### EFFECT OF DELAY

Jim Fagan of Mr. Marggraf's staff advised us on 5/19/82 that Architect Wening filed for a building permit on February 19, 1982 and that it usually takes 3 to 6 months to complete a check of detailed plans and drawings before the city issues a building permit. Although it should be issued momentarily, one had not been issued as of last week. Therefore, we are pressing to resolve this matter in the interest of staying on schedule as much as possible with a proposed new terminal.

### ELIMINATION OF ANTICIPATED CASH "BOOT" TO GLI

1. IP 81–5A estimated architect fees and construction at $4 million while the low bid of $5,990,000 and architect fees to date of $353,257 (includes $60,000 for project supervision during construction), for a difference of $2,343,257. The terminal is also larger than originally estimated, including features not originally anticipated such as a more expensive fueling system and more instation HVAC systems.

2. The IP understated project interest costs and points which are $2,190,882 to date while the total project estimate for interest was only $2,035,843 including the construction period.

### · SUMMARY

Recommend authorization to modify IP 81–5A as outlined on page 1 herein.

(a) Also, because we should be in a position to submit approved proposals in our default notice, and neither alternative has yet been accepted by MB, recommend authority to go as high as a 15% discount rate, or $16,792,000 if all other terms are satisfactory to GLI.

Because the reduced price is simply the present value of $21 million, received now instead of 18 months from now, this really is no concession off the contract price.

It is not our intent to instigate litigation but, instead, to protect our rights due to MB's default by signing a construction contract and failing to submit a project budget in an amount which we could approve. Hopefully, this will bring matters "to a head". And if he cannot resolve this matter, then we should litigate to enforce our $21 million purchase price.

While Architect Wening advises that the project could probably be rebid for $5 million, and Mr. Marggraf concurs, I recommend accepting $5.5 million if MB can renegotiate to that level because:

(a) there is no guaranty of $5 million on rebidding and

(b) rebidding will cause an estimated two month delay.

I believe every reasonable effort should be made to resolve this matter because GLI likes the present design, our old terminal sale price is well over market and the new location would be difficult to improve upon.

If the alternative one present value formula could be accomplished, GLI could "book" an approximate $15 million pretax gain in 1982.

Plaintiff's Exhibit 377.

On July 23, 1982, Greyhound filed the instant action for specific performance, restitution and damages for breach of contract.[7] Defendants filed a counterclaim for specific performance, and damages for breach of contract, rescission and quantum meruit. Both parties withdrew their claims for specific performance before trial and both the complaint and counterclaim were amended subsequently.

Plaintiff amended its complaint to add claims of fraudulent misrepresentation. Plaintiff seeks not only compensatory damages for breach of contract and compensatory and punitive damages for fraudulent misrepresentation but also "restitution by the defendants to Greyhound of the New Terminal Property, free and clear of all liens and encumbrances, in return for the Option price of $8,310,240 to be paid by Greyhound to defendants." Amended Complaint at pp. 17, 18.

---

7. The Court notes that on August 2, 1982, Mr. Bender submitted to Greyhound his revised development budget of $29 million, and the Construction Documents called for under the Exchange Agreement. Defendants' Exhibit 237. Greyhound eventually disapproved that budget. Because this development budget and the Construction Documents were submitted after this suit was filed, the Court will not consider whether this budget met the terms of the Exchange Agreement or whether Greyhound's disapproval was appropriate. Similarly, in making its decision in this case, the Court will not consider any correspondence or actions by the parties that occurred after this suit was instituted, given the possible self-serving motives of the parties.

Defendants amended their answer and counterclaim to add claims of fraudulent inducement to contract and misrepresentation. In connection with their claims for breach of contract, fraud, and misrepresentation, defendants seek rescission or cancellation of the entire Exchange Agreement, restitution, compensatory damages and quantum meruit, including:

> (1) transfer in fee simple of the New Terminal Property from defendants to plaintiff in return for the option price of ($8,310,240) less a deposit of ($35,000) made by Greyhound, to be paid by plaintiff to defendants[,] (2) reimbursement for all costs and indemnifications for all obligations incurred by defendants in performing their obligations under the Agreement to date, including but not limited to interest, (3) compensation for the value of defendants' personal services rendered while performing their obligations under the Agreement, and (4) compensation for all costs and indemnification for all obligations incurred by defendants in connection with the development of the Greyhound Property[.]

Amended Counterclaim at ¶ 41. Defendants also seek compensatory and punitive damages for fraud in the inducement. Essentially, in addition to punitive damages, defendants seek to be made whole, and to recover the money they have expended and the value of the services they have performed in reliance on the agreement.

## CONCLUSIONS OF LAW

[1] In its amended complaint, Greyhound alleges that defendants are liable for breach of contract and fraudulent misrep-

resentation. *See* Counts II, III of Amended Complaint. In their amended counterclaim, defendants allege that Greyhound is liable for material breach and anticipatory breach of the contract, fraud in the inducement, and misrepresentation, and seek rescission and restitution. *See* Counts I, III, IV of Amended Counterclaim.

At the outset, the Court notes that the Exchange Agreement is governed by the laws of the District of Columbia. Exchange Agreement, ¶ 27.1.[8] Therefore, the Court will apply District of Columbia law to the instant dispute.

A threshold issue facing the Court is whether there was a meeting of the minds between the contracting parties. "[T]o establish a contract the minds of the parties must be in agreement as to its terms.... The failure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Owen v. Owen*, 427 A.2d 933, 937 (D.C.1981) (case citations omitted). "To be final, contract negotiations must include all of the terms which the parties intended to resolve; material terms cannot be left to future settlement." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C.1981). Moreover, "[i]n order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." *Id.* In the instant case, the parties had numerous discussions about the terms of the Exchange Agreement, culminating in two days of negotiations in Phoenix, Arizona, on April 16 and 17, 1981. All

---

**8.** Even assuming *arguendo* that this provision were not in the Exchange Agreement or if the agreement were found to be invalid, the Court would apply District of Columbia law to the instant dispute. "In determining the formation and validity of contracts, the District of Columbia applies the law of the jurisdiction with the 'more substantial interest in the resolution of the issue.'" *Owen v. Owen*, 427 A.2d 933, 937 (D.C.1981) (quoting *Fowler v. A & A Co.*, 262 A.2d 344, 348 (1970)). *See also Anderco, Inc. v. Buildex Design, Inc.*, 538 F.Supp. 1139, 1141 n. 2 (D.D.C.1982). Greyhound has its principal place of business in Phoenix, Arizona. All of

the parties, including Greyhound, however, transact business in the District of Columbia. The negotiations preceding the formation of the Exchange Agreement took place primarily in Phoenix but also in Washington, D.C. Performance of the Exchange Agreement occurred in the District of Columbia. Although Arizona has some interest in the resolution of this dispute, the Court finds that the District of Columbia has the more substantial interest. Therefore, even absent an express provision in the Exchange Agreement, the Court would apply District of Columbia law.

of the material terms of the contract were discussed and agreed upon before the Exchange Agreement was executed on April 17, 1981. The fact that the parties signed a written contract clearly evidences their intention to be bound by its terms. *Cf. Anderco, Inc. v. Buildex Design, Inc.*, 538 F.Supp. 1139, 1141 (D.D.C.1982) (no contract formed where parties never came to meeting of minds on essential terms); *Edmund J. Flynn Co. v. LaVay*, 431 A.2d at 547 (no evidence of meeting of the minds: "Both parties agree that no formal sales commission agreement was signed. Since either party was at liberty to stop negotiations and not to complete the bargain, no contract existed.").

The Court also notes, however, that: a contract in form may be avoided by a showing that assent was obtained by fraud or even misrepresentation falling short of fraud. ... If it is shown that the minds of the parties did not meet "honestly and fairly, without mistake or mutual misunderstanding, upon all the essential points involved," there is no contract.

*Hollywood Credit Clothing Co. v. Gibson*, 188 A.2d 348, 349 (D.C.1963) (citations omitted); *see also Bob Wilson, Inc. v. Swann*, 168 A.2d 198, 200 (D.C.1961). The facts and circumstances of the instant case do not warrant a finding by the Court that assent to the Exchange Agreement was obtained by fraud or misrepresentation by either party. *See* discussion *infra*, pp. 1230–1234. In this regard, it is important to note that the principal actors involved in the Exchange Agreement were knowledgeable and experienced businessmen. This is not a situation where one party unfairly took advantage of the other. Both parties entered into the Exchange Agreement freely. *Cf. Bob Wilson, Inc. v. Swann*, 168 A.2d at 200 (used car dealership guilty of fraud in selling used car to Swann).

Therefore, the Court finds that there was a meeting of the minds between the parties to the Exchange Agreement, as well as mutual assent to the essential terms of the Agreement and an intention by both parties to be bound by the Agreement. Having determined the validity of the Exchange Agreement, the Court must examine the parties' specific allegations.

## A. Breach of Contract Claims

■ Each party alleges that the other party materially breached the Exchange Agreement. To determine whether a breach is material, the following factors are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981).

The Court also may consider:

1) to what extent, if any, the contract has been performed at the time of the breach. The earlier the breach the more likely it will be regarded as material. 2) A willful breach is more likely to be regarded as material than ... a breach caused by negligence or by extraneous circumstances. 3) A quantitatively serious breach is more likely to be considered material.

J. Calamari & J. Perillo, *Contracts* § 11–22 (2d ed.1977) (footnotes omitted).

A breach which actually prevents further performance of the contract or provides a valid defense for a party's failure to continue performance would be considered material.

### 1. *Plaintiff's Claims*

▆ Greyhound alleges that the following acts of defendants constituted material breaches of the Exchange Agreement: (1) failing to submit final plans and specifications for the new terminal to Greyhound for approval; (2) entering into a binding construction contract with Edmar without notification or prior approval of Greyhound; (3) failing to furnish the "Construction Documents" required by section 5 of the Exchange Agreement; and (4) submitting an overall budget that Greyhound could not approve, and submitting a "preliminary budget" which was "grossly inflated."

The Court finds that plaintiff's first allegation, that defendants failed to submit final plans and specifications for the new terminal to Greyhound for approval, is without merit. Defendants submitted final construction plans and specifications for the new terminal to Greyhound on December 7, 1981. These plans and specifications were received by Greyhound on December 9, 1981. Defendants submitted two addenda modifying the plans and specifications shortly thereafter. These plans and specifications had been prepared by defendants' architect, Mr. Wening, over a seven-month period. Although Greyhound never approved these plans and specifications, paragraph 5.2 of the Exchange Agreement explicitly states that "GLI shall notify MAB within twenty (20) days after GLI receives the Plans and Specs of GLI's approval or disapproval thereof. *If GLI fails to do either, it shall be deemed to have approved the Plans and Specs.*" (Emphasis added.) Mr. Marggraf testified that with the exception of the liquidated damages clause which was added to the plans in the second addenda, he "would have approved" the plans and specifications. He also testified that he did not notify either Mr. Wening or Mr. Bender within twenty days of receipt of these plans that he disapproved of them. Failing to approve or disapprove the plans and specifications within twenty days of their receipt, Greyhound was deemed to have approved them, pursuant to paragraph 5.2 of the Exchange Agreement.

With regard to plaintiff's second allegation that defendants entered into a binding construction contract with Edmar without notification or prior approval of Greyhound, the Court is faced with a more difficult situation. Defendants argue that the execution of this contract without Greyhound's prior approval does not constitute a material breach of the Exchange Agreement. Defendants argue that because Greyhound is not a party to this contract, it cannot be bound by it. Greyhound, however, argues that this does constitute a material breach and cites paragraph 5.3(b) of the Exchange Agreement which provides that one of the "Construction Documents" defendants are to provide is "[a] 'guaranteed cost' construction contract ... in the latest AIA form executed by the General Contractor *to be entered into with MAB,* as owner ..." and that "[t]he General Contractor must be acceptable to GLI." (Emphasis added.) Greyhound also argues that the Edmar construction contract is legally insufficient because the Edmar bid was not accompanied by a bid bond as required by the specifications. The letter to bidders stated that "Bid bond in the amount of 5 percent of the Base Bid is required." Plaintiff's Exhibit 411.

The Court finds that the Edmar construction contract is in violation of paragraph 5.3(b) of the Exchange Agreement because it was executed by Mr. Bender before it was approved by Greyhound. The Exchange Agreement specifically states that Mr. Bender is to submit to Greyhound a construction contract "to be entered into" with Mr. Bender. Mr. Bender did not have the right, under the Exchange Agreement, to enter into the contract prior to submitting the contract to Greyhound. This would negate the provision in the Exchange Agreement which states that "[t]he General Contractor must be acceptable to GLI." Because plaintiff did not have an opportunity to indicate whether Edmar would be an acceptable contractor, paragraph 5.3 of the Exchange Agreement was breached by Mr. Bender when he entered

into the contract with Edmar on March 1, 1982.

Having found that Mr. Bender breached the Exchange Agreement, the Court must determine whether this breach was material. Mr. Bender testified that he executed the Edmar construction contract because the life of the bid was about to expire and the bid price would not be guaranteed beyond the expiration date. Mr. Wening prepared the construction contract in his office and sent it to Mr. Bender on March 1, 1982. Mr. Bender also testified that because Greyhound was not a signatory to the construction contract, it could not claim to be damaged by his signing the agreement. When Greyhound inquired what it would take to get Edmar to forget the whole deal, however, Mr. Bender indicated that Edmar wanted $200,000 to $250,000. Although Mr. Bender testified that the parties did not discuss who would pay this money to "buy out" Edmar, Mr. Bender did indicate that he was not willing to pay $200,000 or $250,000 because he felt that the Edmar contract was satisfactory. Mr. Bender did concede, however, that he might have had to pay money to Edmar to void the contract.

It is clear, moreover, that Mr. Bender considered himself, as well as Greyhound, to be at least morally bound by this contract. In a letter dated May 21, 1982, Mr. Bender told Mr. Ervanian that to "rebid the project ... would be a waste of time" and "as I have advised you in numerous conversations, we not only have a signed contract with Edmar Construction Company, but a moral obligation as well for their constructing the project." Plaintiff's Exhibit 355. Mr. Bender concluded his letter by indicating that Greyhound's proposal to redo the plans and specifications and rebid the project, which would impact on the signed contract with Edmar, was one of "two great stumbling blocks" to resolving this matter. *Id.*

The Court also notes that Mr. Bender indicated in a discussion with Mr. Duncan of the American Security Bank on June 15, 1982, that one of the problems he had was that a contract was "let for construction." Plaintiff's Exhibit 99. Clearly, Mr. Bender considered the Edmar contract to be binding on all the parties.

The Court cannot find, however, that Mr. Bender's signing of the contract constituted a material breach of the Exchange Agreement. Although Greyhound is correct in indicating that Mr. Bender entered into a binding contract with Edmar, this contract was not binding on Greyhound. Greyhound was not a party to the contract, thus could not be bound by it. As a result, Greyhound still had the ability and the right to review and approve or disapprove both the contract and the contractor. At most, Mr. Bender's action constituted a technical breach of the Exchange Agreement because he would not have been able to provide, in its proper form, one of the Construction Documents called for in the Exchange Agreement, specifically, a " 'guaranteed cost' construction contract ... *to be entered into* with MAB." Exchange Agreement, ¶ 5.3(b) (emphasis added). However, Greyhound's rights of approval or disapproval of this Construction Document would not have been affected by Mr. Bender's action. Greyhound still had the right to disapprove the contract, as long as its disapproval was not arbitrary. Exchange Agreement, ¶ 5.3.

Plaintiff also argues that acceptance of Edmar as the successful bidder without a bid bond is a direct violation of the contract specifications and cannot be waived without its approval. In addition to the contract specifications which require a bid bond, one of the "Construction Documents" called for under the Exchange Agreement is "[a] performance and payment bond (the "Bond") in the customary statutory form for the District of Columbia and issued by a bonding company reasonably acceptable to GLI, which Bond shall guarantee the performance of and payment by the General Contractor under the Construction Contract." Exchange Agreement, ¶ 5.3(c). Mr. Bender testified that no bid bond would be issued until the contract was approved. He stated that if Mr. Stein

issued a bid bond for this project, his bonding capacity was decreased and unspecified problems could arise if the contract failed to go through. The Court finds Mr. Bender's testimony in this regard unpersuasive and notes that the SB Construction Company bid did include a bid bond. Defendants' Exhibit 116. Once again, however, the Court must find that Mr. Bender's breach of the contract specifications constitutes an immaterial breach. Greyhound had the right to disapprove the construction contract and could have done so on this basis. Moreover, under the terms of the Exchange Agreement, Mr. Bender did not have to submit the performance and payment bond until April 29, 1982. Exchange Agreement, ¶ 5.3. None of these documents were submitted, however, because on March 31, 1982, Mr. Bender was told not to go forward with performance of the Exchange Agreement.

With regard to plaintiff's third allegation that Mr. Bender failed to furnish the "Construction Documents" required by section 5 of the Exchange Agreement, the Court notes at the outset that on March 31, 1982, Mr. Shew told Mr. Bender to "hold at this point in time." As a result, Mr. Bender did not submit the final total guaranteed project budget, which would have been due on April 29, 1982, i.e., 120 days after the final plans and specifications were deemed approved. Exchange Agreement, ¶ 5.3. Mr. Bender also did not submit a performance and payment bond which was to be submitted on April 29, 1982, as required by paragraph 5.3(c) of the Exchange Agreement and Article 9 of the construction contract specifications. See Plaintiff's Exhibit 411, p. 00100–3. Similarly, insurance certificates required under paragraph 5.3(d) of the Exchange Agreement were never submitted. Given the statement by Mr. Shew, however, the Court cannot find that Mr. Bender was in material breach of the Exchange Agreement because he failed to submit these Construction Documents to Greyhound by April 29, 1982.

Finally, Greyhound alleges that Mr. Bender submitted an overall budget that Greyhound could not approve and that the "preliminary budget" he submitted on March 8, 1982, was "grossly inflated." With regard to the construction costs, Greyhound argues that the three architects who were most familiar with the project, Messrs. Wening, Marggraf, and Fagan, believed that the terminal could be built for $5 million or less and that a contract estimate of $3.4 million was quoted in the Exchange Agreement.

Although a $3.4 million construction cost estimate was included in the Exchange Agreement, this was purely an estimate. Before the Exchange Agreement was signed, Greyhound expressly represented to Mr. Bender that he would not be bound by the $3.4 million construction cost estimate. Moreover, this estimate was based on preliminary plans for the new terminal as well as on square footage calculations. By the time the final plans and specifications were submitted in December 1981, the preliminary plans had undergone extensive changes which increased the scope and cost of the project. As Greyhound correctly argues, Mr. Marggraf indicated that when the new terminal project was ready to be bid in December 1981, he thought the bids would be about $4.5 million. Moreover, Mr. Wening, who was undoubtedly the most familiar with the final plans and specifications, indicated that he thought the project would be bid between $4.7 and $5.1 million. All of these figures are significantly above the $3.4 million estimate in the Exchange Agreement. Clearly, Greyhound's continuous focus on the $3.4 million estimate as a viable gauge in determining what the actual construction cost should be was unreasonable. Although Greyhound cites the estimates made by Messrs. Wening, Marggraf, and Fagan, the Court is cognizant of the fact that Greyhound's primary focus was on the $3.4 million estimate that was in the Exchange Agreement.

The Court also notes that the $5.9 million construction contract submitted by Mr. Bender represented the low bid on the project, although the Court recognizes that

only two bids were received. The second bid was for $6,015,000.

Even assuming *arguendo* that Greyhound considered defendants' preliminary development budget to be unreasonable or grossly inflated when it was submitted on March 8, 1982, at that time, defendants could not have been considered to be in breach of the Exchange Agreement because the agreement gave defendants sixty days within which to cure Greyhound's objections. Paragraph 5.3 of the Exchange Agreement states in pertinent part: "If GLI notifies MAB of GLI's disapproval of *any* of the Construction Documents, MAB shall have sixty (60) days thereafter within which it shall cure GLI's objections to same." (Emphasis added.) Before the sixty days had run, however, not only had Greyhound decided to "undo the deal," *see* discussion *infra,* but also Mr. Bender had been told by Mr. Shew to "hold at this point in time," thus, effectively preventing him from curing or attempting to cure Greyhound's objections to any of the Construction Documents. Under these circumstances, the Court must reject plaintiff's allegations that defendants breached the Exchange Agreement by failing to submit the required Construction Documents, failing to submit an overall budget that Greyhound could approve, or submitting a preliminary budget that was "grossly inflated."

Greyhound also attacked defendants' total development budget, a preliminary version of which was submitted to it on March 8, 1982, contending that defendants were required to provide more in the way of "back up" material for these projected costs. The Court notes, however, that paragraph 5.3(a) merely provides that:

> The total guaranteed project budget ... shall include all costs and expenses to be incurred by MAB in connection with the acquisition, development and exchange of the MAB Property, for the purpose intended therefor, up through and including when title is taken by GLI of the MAB Property.

This provision does not require any more detail than what was supplied in the budget on March 8, 1982. Moreover, paragraph 5.3 of the Exchange Agreement, which provides that defendants shall have sixty days to cure any of Greyhound's objections to the Construction Documents, applies to the total guaranteed project budget. Mr. Bender was never given an opportunity to cure Greyhound's objections to this Construction Document.

In accordance with the above, the Court rejects all of plaintiff's allegations that defendants materially breached the Exchange Agreement. Although defendants breached a term of the Exchange Agreement when Mr. Bender signed the construction contract with Edmar, this action does not constitute a material breach.

### 2. *Defendants' Claims*

■ In its amended counterclaim, defendants allege that Greyhound arbitrarily, wrongfully, and maliciously denied that it had approved final plans and specifications and that Greyhound arbitrarily, wrongfully, and maliciously refused to approve the Construction Documents that defendants submitted in full and good faith compliance with the Exchange Agreement.

Aside from these allegations, the Court finds that Greyhound's decision to "undo the deal," first discussed at the internal meeting on March 1, 1982, and confirmed as of March 11, 1982, was tantamount to repudiating the Exchange Agreement. "For a repudiation of a contract by one party to be sufficient to give the other party the right to recover for breach, the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Order of Ahepa v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C.1976), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977).

The Exchange Agreement called for Mr. Bender to construct the new terminal and then exchange it with Greyhound for its old terminal. As of no later than March 11,

1982,[9] however, Greyhound had decided to "undo" or "restructure" the deal. All of Greyhound's proposals to this end contemplated that Mr. Bender would have nothing to do with the development of the new terminal as was provided for in the Exchange Agreement. Instead, Greyhound would take over the construction project and Mr. Bender's sole involvement would be to buy the old terminal for $21 million. Although Mr. Ervanian characterized these proposals as a means of "restructuring" the deal, "undoing" the deal is a much more appropriate term. Clearly, the predominant terms of the Exchange Agreement would not be carried out under these proposals.

On March 1, 1982, before Mr. Bender had submitted his preliminary budget and before Greyhound had even met with him, Greyhound officials met privately and discussed the benefits of GLI's developing the new terminal, rather than Mr. Bender. *See* Defendants' Exhibit 128. At a subsequent meeting on March 10, 1982, a consensus of opinion was reached by Greyhound that if it could undo the Bender deal and settle with him, it would be better off to do the project itself. Greyhound's self-described "clout" was that it owned the property that Mr. Bender wanted. Defendants' Exhibit 146. In early March 1982, Greyhound realized that given the preliminary budget figures quoted by Mr. Bender, Greyhound would not receive the $5 million boot it had anticipated and that in fact it might have to pay money to Mr. Bender if the cost of the new terminal exceeded $21 million. *See* Defendants' Exhibit 59. As a result, Greyhound considered the money it could save on interest, legal fees, and insurance costs if it handled the project itself and also considered rebidding the project to get a lower construction cost. Finally, Greyhound took into account that it was no longer as advantageous to have a tax-free exchange given the change in the tax laws regarding depreciation.

Although Mr. Ervanian denied that there was a meeting on March 1, 1982, he testified that as of March 11, 1982, he had determined that Mr. Bender would not do the development because Greyhound had decided that it could develop the new terminal site more cheaply itself. In addition, on March 31, 1982, Mr. Shew had told Mr. Bender "to hold at this point in time." Defendants' Exhibit 165. It is clear to the Court that Greyhound not only had decided in March 1982 that Mr. Bender would not construct the new terminal property but had also communicated this fact to Mr. Bender, thus repudiating the Exchange Agreement. *See Ahepa v. Travel Consultants, Inc.,* 367 A.2d at 125.

The Court also notes that Greyhound refused to consider any proposals for "restructuring" or "undoing" the Exchange Agreement that involved Mr. Bender in the development of the new terminal and that did not require Mr. Bender to pay $21 million for the old terminal, with the exception of one proposal Greyhound suggested whereby they would "[a]ccept the present value of the $21 million purchase price, discounted at 14% over 18 months, in the sum of $17 million." Plaintiff's Exhibit 377. Greyhound indicated, however, that "[b]ecause the reduced price is simply the present value of $21 million, received now instead of 18 months from now, this really is no concession off the contract price." *Id.* Although Greyhound had decided that it could no longer go through with the Exchange Agreement, and that Mr. Bender was no longer acceptable to it as the developer, it expected Mr. Bender to go through with that part of the Exchange Agreement that called for Mr. Bender to buy the old terminal property for $21 million.

The Court also notes that although the Exchange Agreement gives Greyhound the right to disapprove the final plans and specifications and Construction Documents, in the event of disapproval, the Exchange Agreement also requires that defendants

---

**9.** Even Mr. Ervanian admits that as of March 11, 1982, Greyhound had decided that Mr. Bend- er would not develop the new terminal.

be given sixty days notice thereof within which to cure the objections stated in Greyhound's notice of its disapproval. Exchange Agreement, ¶¶ 5.2, 5.3. The Exchange Agreement does not contain a clause whereby Greyhound can decide to "undo the deal" merely because it determines that this would be financially beneficial. The only right of actual termination afforded to Greyhound is found in paragraph 18.1 of the Exchange Agreement. It states in pertinent part:

> GLI, at GLI's sole election, may terminate this Agreement, by prompt notice to MAB, and this Agreement shall be null and void, *if any one or more of the following conditions or state of facts shall exist at the time of Closing:*
>
> * * * * * *
>
> (b) *GLI shall have exercised any rights of disapproval as stated in this Agreement and MAB shall have failed or been unable to cure* diligently and properly, the objection or reason giving rise to such disapproval.

Exchange Agreement, ¶ 18.1(b) (emphasis added).

Greyhound never exercised any of its rights of disapproval. As a result, defendants never had a chance to cure plaintiff's objections.

In accordance with the above, the Court finds that Greyhound acted in bad faith [10] and materially breached and repudiated the Exchange Agreement when it decided to "undo the deal" in March 1982. Discussions about "undoing the deal" began on March 1, 1982, before Greyhound even received Mr. Bender's proposed budget. By March 11, 1982, Greyhound had decided that Mr. Bender would not be involved in developing the new terminal and that it would take over development of the new terminal site. Mr. Bender was not to have any further role in this development project. This decision was made before Mr. Bender even had an opportunity to submit all the documents necessary for Greyhound to approve or disapprove the budget. Moreover, the budget that he submitted on March 8, 1982, was clearly marked "preliminary." The Exchange Agreement also provided that Mr. Bender would have the opportunity to cure any objections Greyhound might have to the budget in the event Greyhound did not approve it. Mr. Bender also was not given this opportunity. Clearly, Greyhound's decision violates the clear terms of the Exchange Agreement and evidences its bad faith.

### B. Fraud Claims

■ The elements of a claim for fraud are as follows: "(1) a deliberate misstatement of fact, (2) made with the intent to deceive another person, (3) reasonably relied upon by the deceived person, (4) which reliance proximately and directly results in damages to that person." *Shear v. National Rifle Association,* 606 F.2d 1251, 1259 (D.C.Cir.1979) (case citations omitted); *see also Feltman v. Sarbov,* 366 A.2d 137, 140–41 (D.C.1976) (citing *Rosenberg v. Howle,* 56 A.2d 709, 710 (D.C.1948)). Fraud "must be established by clear and convincing evidence, which is not equally consistent with either honesty or deceit." *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978).

#### 1. *Plaintiff's Claims*

In Count III of the amended complaint, Greyhound seeks restitution and damages for fraudulent misrepresentation. Greyhound alleges three misrepresentations by Mr. Bender: (1) that "[d]uring the period of negotiation for and performance of the

---

**10.** Greyhound's further bad faith is evidenced by the "default letter" it sent to Mr. Bender on June 28, 1982. Defendants' Exhibit 217. This letter accused Mr. Bender of breaching the Exchange Agreement because he had not furnished all of the required Construction Documents, he had entered into a construction contract without the approval of Greyhound, and he had not furnished a contract which Greyhound could approve. Although it is true that Mr. Bender did not submit these Construction Documents, he had been told by Mr. Shew on March 31, 1982 to "hold at this point in time." As a result, he did not submit the Construction Documents which would have been due on April 29, 1982.

Agreement, defendant Bender repeatedly represented to plaintiff Greyhound that he had the funds necessary to purchase the New Terminal Property and to construct the New Terminal[,]" Amended Complaint at ¶ 40; (2) that "[o]n or about April, 1982, Bender represented to Greyhound that he had executed on June 15, 1981, a promissory note to American Security Bank which contained a sixteen (16%) percent interest rate floor[,]" *id.* at ¶ 44; and (3) that "[d]efendant Bender represented to Greyhound that he would, in good faith, engage in a competitive bid process in order to obtain a reasonable and competitive construction contract price." *Id.* at ¶ 46.

With regard to Mr. Bender's first alleged misrepresentation, *i.e.*, that Mr. Bender represented that he had the funds necessary to purchase the new terminal property and construct the new terminal, clearly Mr. Bender did not misrepresent that he had the funds necessary to purchase the new terminal property. Mr. Bender obtained a $10 million loan from the American Security Bank in June 1981 in order to buy this property. Thus, Mr. Bender did have the funds to purchase this property. Greyhound was aware that Mr. Bender would be financing the development project. Mr. Bender had asked for the entire $21 million from the bank in June 1981, to cover both the purchase of the property and construction of the terminal, but the bank only approved a loan for $10 million. This fact, however, does not convince the Court that Mr. Bender's representations with regard to financing of the project were fraudulent.

Moreover, Mr. Bender's representations that he had the funds necessary to construct the new terminal, cannot constitute fraud because Greyhound never gave Mr. Bender the necessary approval to construct the new terminal. One of the necessary elements of a fraud claim is that a person be damaged as a result of their reliance on a misrepresentation. Even assuming *arguendo* that Mr. Bender's statement that he had the funds necessary to construct the terminal was a deliberate misstatement of fact, and the Court does not believe it was, Greyhound has not shown that it relied to

its detriment on this misstatement. Greyhound decided to "undo the deal" before it was even necessary for Mr. Bender to have funds available to construct the terminal.

With regard to Mr. Bender's second alleged misrepresentation, *i.e.*, that on or about April 1982, he represented that he had executed a promissory note to the American Security Bank which contained a sixteen percent interest rate floor, even assuming *arguendo* that this were false, Greyhound failed to prove how it reasonably relied to its detriment on that misrepresentation. Greyhound states in its amended complaint:

> Greyhound reasonably relied upon said representations of Bender in taking, and was induced by said representations of Bender to take, the following actions:
>
> (a) Execution of the Agreement;
>
> (b) Consenting to the assignment of Bender's rights under the Agreement to Michael Murray Associates;
>
> (c) Attempting repeatedly to obtain an acceptable budget from defendant Bender; and
>
> (d) Assigning the Option to Purchase to Bender.

Amended Complaint, ¶ 53. "Actions" (a), (b), and (d), however, could not have been taken by Greyhound in reliance on Mr. Bender's alleged "interest floor" misrepresentation of April 1982 because these actions by Greyhound happened at least one year before the alleged misrepresentation.

The only remaining "action" taken in alleged reliance on Mr. Bender's alleged "interest floor" misrepresentation is (c), "[a]ttempting repeatedly to obtain an acceptable budget from defendant Bender." Greyhound has failed to explain, however, how this action is related to Mr. Bender's alleged "interest floor" misrepresentation. In any event, Greyhound could not have been damaged by this alleged misrepresentation because the interest rate charged Mr. Bender, *i.e.*, prime plus two percent, never went below sixteen percent from June 15, 1981, to April 1982. Because Greyhound has not shown that it relied to

its detriment on this alleged misrepresentation, it has failed to prove this portion of its fraud claim.

With regard to Mr. Bender's third alleged misrepresentation, *i.e.*, that he represented that he would, in good faith, engage in a competitive bid process, the Court notes that the Exchange Agreement does not require Mr. Bender to engage in a competitive bid process. Greyhound also fails to specify where Mr. Bender allegedly made such an agreement. Greyhound drafted the Exchange Agreement and could have included a requirement for a competitive bid process. Finally, Greyhound was put on notice when it received the plans and specifications and bid letters in early December 1981, that the bid opening was to be private and that Mr. Bender had the ability to waive any irregularities in the bids and bidding. Defendants' Exhibit 106. Greyhound never raised any objection to this process until after Mr. Bender had received the bids and after it had decided to "undo the deal." Because the Exchange Agreement gave Greyhound twenty days to approve or disapprove these plans and specifications, and Greyhound failed to object at that time, *see* Exchange Agreement, ¶ 5.2, the Court finds that Greyhound has waived any claim for fraud based on the bid process.

Accordingly, the Court finds that Greyhound has failed to prove a claim for fraudulent misrepresentation and dismisses Count III of its amended complaint.

### 2. *Defendants' Claims*

■ In Count III of the Amended Counterclaim, defendants allege that they were induced fraudulently

to enter into the Exchange Agreement, to exercise the option to purchase the New Terminal Property, to hire the architects, engineers and others necessary to develop the New Terminal Property to Greyhound's specifications, to borrow money to finance the development, and to expend their own time, money, and energy in developing the New Terminal Property, and to exchange the New Terminal Property for the existing Greyhound terminal property upon the completion of the development of the New Terminal....

Amended Counterclaim, ¶ 46. In Count IV, defendants allege fraudulent misrepresentation by Greyhound.

Defendants allege that Greyhound made the following misrepresentations and omissions of fact: (1) "that the $3.4 million figure referred to in the Exchange Agreement was only plaintiff's estimate of the construction cost, as of April 17, 1981, and was not binding upon defendants[,]" *id.* at ¶ 47; (2) "that its approval under the Exchange Agreement, of any construction documents, plans, specifications, budgets, and contracts would not be withheld so long as the construction documents, etc., submitted were reasonable in light of the market conditions and circumstances existing at the time in the Washington, D.C. area in the construction industry for a developer in defendants' position[,]" *id.* at ¶ 49; and (3) "that it would approve any reasonable budget for development of the New Terminal Property, including, specifically any reasonable budget in excess of $21 million." *Id.* at ¶ 51.

With regard to Greyhound's first alleged misrepresentation, *i.e.*, that the $3.4 million figure referred to in the Exchange Agreement was in fact only an estimate of the construction cost of the new terminal and not binding on defendants, this figure was an estimate and was so described in the Exchange Agreement. *See* Exchange Agreement, ¶ 5.1. Moreover, the fact that Mr. Ervanian considered it only as an estimate is evidenced by his statement to Mr. Bender in February 1982, that he thought the Edmar bid of $5.9 million was about a million dollars too high. Clearly, if Mr. Ervanian considered the $3.4 million figure to be a viable estimate at that time, he would have so indicated. Although the Court recognizes that Greyhound focused primarily on the $3.4 million figure in its discussions with Mr. Bender, Greyhound also was cognizant of the fact that its own architects, as well as Mr. Wening, had esti-

mated that the project would be bid for $4.5 to $5.1 million. The Court does not believe that Greyhound considered the $3.4 million construction cost estimate to be binding. Therefore, Greyhound cannot be found to have misrepresented defendants in this regard.

With regard to Greyhound's second alleged misrepresentation, *i.e.*, that its approval of construction documents, plans, specifications, budgets, and contracts under the Exchange Agreement would not be withheld so long as these documents were reasonable, the Court also cannot find that Greyhound misrepresented this fact. Even assuming *arguendo* that Greyhound deliberately misstated its approval policy, defendants have failed to show that they reasonably relied on this statement and were damaged as a result. Because Greyhound decided to "undo the deal" before the majority of these documents even had to be submitted to Greyhound, defendants cannot show that they have been damaged. With respect to those documents that were submitted in their final form, *i.e.*, the plans and specifications, Greyhound neither formally approved nor disapproved them. Under the terms of the Exchange Agreement, they were deemed approved after twenty days. Exchange Agreement, ¶ 5.2. Clearly, defendants were not damaged as a result.

With regard to Greyhound's third alleged misrepresentation, *i.e.*, that it would approve any reasonable budget for the development of the new terminal, including one in excess of $21 million, the Court also cannot find that Greyhound misrepresented this fact. Even assuming *arguendo* that Greyhound deliberately misstated that it would approve a reasonable budget over $21 million, defendants cannot show that they reasonably relied on this statement and were damaged as a result. Because Greyhound decided to "undo the deal" before Mr. Bender was required to submit a final budget, the Court cannot find that defendants were damages as a result of this alleged misstatement.

Defendants also allege that Greyhound entered into the Exchange Agreement intending to approve no development budget in excess of $16 million and Greyhound not only withheld this fact from Mr. Bender but also affirmatively represented to the contrary in the language of the Exchange Agreement.

The Court notes that the Exchange Agreement does not contain a ceiling of $16 million for the development budget. Moreover, it indicates that the $3.4 million figure given for the construction contract is only an estimate. Finally, the Exchange Agreement does not mention a $5 million "boot" payable to Greyhound at the time the properties were to be exchanged.

The Investment Proposal submitted to the Greyhound Board of Directors, however, indicates in pertinent part, "[t]he difference between the proposed exchange facility and land cost estimated to be $16 million and the $21 million sale price, or approximately $5 million depending on an actual final cost of exchange facility, will be paid to Greyhound Lines, Inc. in the form of a cash 'boot'." Defendants' Exhibit 59 at 9th page. Mr. Bender was never informed about the $16 million estimate or that Greyhound expected a $5 million "boot."

In a letter dated July 16, 1982, from Mr. Shew to Leonard C. Greenebaum, Mr. Bender's attorney, Mr. Shew stated in pertinent part:

at the meeting held on June 17, 1982 with Mr. Bender and two officers of American Securities [sic] Bank, attended by F.E. Lake, Vice President and Treasurer, and Armen Ervanian, Vice President—Real Estate, Mr. Ervanian made it clear that *any budget at about $17 million would still be approved and accepted by Greyhound but that the estimated budget dated March 8, 1982 in the sum of $26,-440,000 was grossly excessive* and, therefore, unacceptable. On this point, please keep in mind that the Exchange Agreement between Bender and Greyhound Lines, Inc. had an estimated [construction] cost of $3,400,000.

Defendants' Exhibit 230 (emphasis added). This correspondence indicates that Greyhound was prepared to approve a development budget in excess of $16 million.

Although the evidence clearly indicates that Greyhound expected at the time the Exchange Agreement was entered into that the development costs of the new terminal would not exceed $16 million and that Greyhound would receive $5 million upon the exchange of the old and new terminal properties, the Court cannot find that this expectation rises to the level of fraud against Mr. Bender. With regard to the Investment Proposal, Greyhound officials simply sought to present this proposal in the best light possible. Although Greyhound officials may have had unrealistic expectations with regard to the final cost of the terminal project, defendants have not shown by clear and convincing evidence that these officials made deliberate misstatements of fact with the intent to deceive defendants, and that these misstatements were relied on by defendants, causing damages. *See Shear v. National Rifle Association,* 606 F.2d at 1259; *Bennett v. Kiggins,* 377 A.2d at 59.

Accordingly, the Court finds that defendants have failed to prove a claim of fraudulent inducement or fraudulent misrepresentation against plaintiff and dismisses Counts III and IV of defendants' amended counterclaim.

## C. Remedies

■ The Court has found plaintiff in material breach of the Exchange Agreement. Although the Court also found that defendants breached a term of the Exchange Agreement, it determined that this was not a material breach. "[O]nly where the breach is material ... is one able to elect the alternative rights and remedies available to him." *Fowler v. A & A Co.,* 262 A.2d 344, 347 (D.C.1970) (case citations omitted). Because only plaintiff materially breached the Exchange Agreement, the Court finds that only defendants are entitled to relief.

As noted above, defendants withdrew their claims for specific performance prior to trial. Accordingly, the Court will order rescission of the Exchange Agreement and restitution [11] to defendants. Defendants' " 'restitution interest' ... is [their] interest in having restored to [them] any benefit that [they have] conferred on the other party." Restatement (Second) of Contracts § 344(c) (1981). Defendants are entitled to restitution "only to the extent that [they] have conferred a benefit on the other party by way of part performance or reliance." *Id.* at § 370; *see also Yurchak v. Jack Boiman Construction Co.,* 3 Ohio App.3d 15, 443 N.E.2d 526, 528 (1981); D. Dobbs, *Remedies* § 12.1 (1973).

Pursuant to the Exchange Agreement, Mr. Bender exercised the option held by Greyhound and purchased the new terminal site for $8,310,240 on June 15, 1981. Mr. Bender purchased this property for Greyhound's benefit. Mr. Bender was to develop the new terminal site and then exchange this property for the old terminal site. Mr. Bender had no interest in the new terminal site and only purchased it pursuant to the terms of the Exchange Agreement with the understanding that Greyhound would take title to it at the completion of this project. Mr. Bender's expenditures with respect to this property also included interest pay-

---

11. Although the Court recognizes that normally in a situation where both parties have breached the contract, restitution is unavailable and courts simply leave both parties as they find them, *see* Restatement (Second) of Contracts § 197 (1981), the Court must reiterate that only Greyhound materially breached the Exchange Agreement. *See id.* at § 198 comment 6. Moreover, because Mr. Bender exercised the option on the new terminal property solely for Greyhound's benefit and fully expected that after he had developed the new terminal, he would ex-

change this property for Greyhound's old terminal site, which is the piece of property he was interested in acquiring from the outset, it would be particularly egregious to leave the parties where the Court found them. At this point, Greyhound's costs arising out of the Exchange Agreement have been minimal. Mr. Bender, on the other hand, has expended millions of dollars in purchasing the new terminal property, making interest payments on the property, and paying architectural and engineering fees.

ments he made on it, as well as architectural and engineering fees he paid to the firm of Mills, Clagett & Wening to develop plans and specifications for the new terminal, together with the cost of razing an undesirable building on the site and taking earth borings.

Accordingly, defendants are entitled to recover the option price of the new terminal property and the expenses they incurred in undertaking to develop this property, including interest payments and architectural and engineering fees that were paid to Mills, Clagett & Wening. Upon appropriate payment by plaintiff, this property shall be transferred in fee simple to Greyhound.

The Court also finds that Mr. Bender is not entitled to a pro-rated portion of the $1 million "construction fee" he included in his preliminary budget submitted to Greyhound on March 8, 1982. The Exchange Agreement does not contain any type of provision for a construction or developer's fee.

Finally, the Court finds that defendants are not entitled to an award of attorneys' fees. *See* D. Dobbs, *Remedies* § 3.8 (1973) and cases cited therein ("The general rule, apart from statute, is that the prevailing party in litigation is not entitled to recover any sum for his attorneys' fees."). The Court also notes that paragraph 20.1 of the Exchange Agreement states in pertinent part: "the parties shall pay their own respective expenses, including attorney's fees, incident to the preparation and performance of this Agreement, whether or not the transactions contemplated herein are consummated, except those included in the Budget."

## CONCLUSION

In accordance with the above, the Court finds that plaintiff Greyhound materially breached the Exchange Agreement by repudiating it in March 1982, and that neither party proved that the other engaged in fraudulent conduct. Therefore, the Court rescinds the Exchange Agreement and awards restitution to defendants. An appropriate order is attached.

## ORDER

Upon consideration of the testimony and evidence presented at trial, and for the reasons stated in the accompanying memorandum opinion, it is by the Court this 31st day of July 1984,

ORDERED that plaintiff's complaint be and hereby is dismissed; it is further

ORDERED that judgment be and hereby is entered in favor of defendants and against plaintiff on defendants' counterclaim for breach of contract; it is further

ORDERED that plaintiff be and hereby is found in material breach of the Exchange Agreement executed by the parties on April 17, 1981; it is further

ORDERED that the Exchange Agreement be and hereby is rescinded; it is further

ORDERED that plaintiff shall pay to defendants the option price of $8,310,240 defendants paid to obtain the property at 90 K Street, N.E., Washington, D.C., on June 15, 1981, less any deposit made by plaintiff for this property; it is further

ORDERED that upon payment by plaintiff of this sum of money, defendants shall transfer this property in fee simple to plaintiff; it is further

ORDERED that plaintiff shall reimburse defendants for all costs and indemnifications for all obligations incurred by defendants in performing their obligations under the Exchange Agreement, including but not limited to interest payments on the property at 90 K Street, N.E., Washington, D.C., and fees paid for architectural and engineering services; it is further

ORDERED that plaintiff shall reimburse defendants for all their costs incurred in this litigation; it is further

ORDERED that neither party shall be entitled to attorneys' fees; it is further

ORDERED that Counts III and IV of the amended counterclaim be and hereby are dismissed; and it is further

ORDERED that upon entry of this judgment, this action be and hereby shall be dismissed.

APPENDIX A

GREYHOUND—BENDER

AGREEMENT FOR EXCHANGE

OF

REAL PROPERTIES

DATED AS OF

APRIL 17, 1981

TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| 1.0 | Preliminary Statements | 1237 |
| 2.0 | Option | 1237 |
| 3.0 | Acquisition of the MAB Property | 1237 |
| 4.0 | Exchange of Property | 1237 |
| 5.0 | Construction of Improvements on the MAB Property | 1237 |
| 6.0 | Construction Loans | 1240 |
| 7.0 | Exchange Price | 1240 |
| 8.0 | Survey | 1241 |
| 9.0 | Warranties | 1241 |
| 10.0 | Examination of Title and Defects in Title | 1241 |
| 11.0 | Conveyance of the GLI Property | 1241 |
| 12.0 | Conveyance of the MAB Property | 1242 |
| 13.0 | Closing | 1242 |
| 14.0 | Prorations | 1242 |
| 15.0 | Removal | 1242 |
| 16.0 | The GLI Property | 1242 |
| 17.0 | Termination by MAB | 1242 |
| 18.0 | Termination by GLI | 1243 |
| 19.0 | Possession of Property | 1244 |
| 20.0 | Fees | 1244 |
| 21.0 | No Commission | 1244 |
| 22.0 | Prior Discussions and Amendments | 1244 |
| 23.0 | Interpretation | 1244 |
| 24.0 | Notices | 1244 |
| 25.0 | Successors and Assigns | 1245 |
| 26.0 | Time of the Essence | 1245 |
| 27.0 | Governing Law | 1245 |
| 28.0 | Miscellaneous | 1245 |
| 29.0 | Counterparts | 1245 |

## AGREEMENT FOR EXCHANGE OF REAL PROPERTIES

THIS AGREEMENT is made as of the 17th day of April, 1981,

*between*

GREYHOUND LINES, INC., a

California corporation ("GLI")

*and*

MORTON A. BENDER,

an individual and U.S. citizen ("MAB")

### 1.0 PRELIMINARY STATEMENTS

1.01 GLI is the fee simple owner of the real property situate in Washington, D.C. and described on attached Schedule A (the real estate, together with all appurtenances thereto and any improvements now or hereafter erected thereon are herein referred to as the "GLI Property").

1.02 GLI has obtained an Option (the "Option") to acquire the real property situate in Washington, D.C. and described in the Option attached as Schedule B (the real estate, together with all appurtenances thereto and any improvements now or hereafter erected thereon, including those erected by MAB in accordance herewith, are herein referred to as the "MAB Property").

1.03 Contemporaneously with the execution of this Agreement, GLI assigns to MAB the Option.

1.04 MAB desires to acquire the GLI Property in exchange for the MAB Property and GLI is unwilling to relinquish the GLI Property except in exchange for the MAB Property.

1.05 The execution by GLI of this Agreement shall be subject to, and GLI's performance hereunder shall be subject to the condition precedent that the Board of Directors of GLI shall have approved same prior to May 13, 1981. If GLI shall not have notified MAB by May 18, 1981, that its Board of Directors approval was given, this Agreement automatically shall be cancelled and deemed null and void.

### 2.0 OPTION

2.1 GLI hereby assigns to MAB the Option. MAB hereby agrees to acquire fee simple ownership of the MAB Property prior to June 16, 1981, from its owner, William P. Hallman.

### 3.0 ACQUISITION OF THE MAB PROPERTY

3.1 GLI and MAB acknowledge that MAB, as buyer, shall acquire the MAB Property for the aggregate purchase price of Eight Million Three Hundred Ten Thousand Two Hundred Forty Dollars ($8,310,240) inclusive of all brokers' commissions due in accordance with the Option. MAB shall pay the full purchase price for the MAB Property in one lump sum cash payment at the closing thereof. A title insurance commitment (the "Commitment") issued by Columbia Real Estate Title Insurance Company, attached as Schedule C, has been obtained which discloses the current status of title to the MAB Property. GLI hereby acknowledges its approval of the status of title to the MAB Property as shown on the Commitment. MAB agrees to acquire the MAB Property, subject only to the exceptions shown on the Commitment, except all Items on Schedule BI and Items 3, 4 and 5 on Schedule BII shall have been eliminated.

### 4.0 EXCHANGE OF PROPERTY

4.1 GLI hereby agrees to grant, bargain and convey the GLI Property to MAB in exchange for which MAB hereby agrees to grant, bargain and convey the MAB Property to GLI.

### 5.0 CONSTRUCTION OF IMPROVEMENTS ON THE MAB PROPERTY

5.1 Within one hundred eighty (180) days from the date hereof, MAB shall cause to be prepared and submitted to GLI for its review and approval or disapproval, which right of disapproval shall be absolute, final plans and specifications (the "Plans and Specs") prepared by Mills, Clagett & Wenning, A.I.A. (the "Architect") generally in accordance with the pre-design plans pre-

pared by GLI and attached as Schedule D), for the construction on the MAB Property of the bus terminal facility (the "Improvements") at an estimated cost of Three Million Four Hundred Thousand Dollars ($3,400,000). However, GLI's approval of the Plans and Specs shall not be considered as waiver of liability for errors or omissions of MAB, the Architect, the project manager, if any, and the General Contractor (the "General Contractor") or any subcontractor.

GLI agrees to cooperate fully with MAB and promptly make available to MAB upon its request all GLI's available data reasonably required to enable MAB to design and construct the Improvements.

5.2 GLI shall notify MAB within twenty (20) days after GLI receives the Plans and Specs of GLI's approval or disapproval thereof. If GLI fails to do either, it shall be deemed to have approved the Plans and Specs. If GLI disapproves the Plans and Specs, MAB shall have sixty (60) days after notice thereof within which to cause the objections stated in GLI's notice of its disapproval to be cured.

5.3 Within one hundred twenty (120) days from the date of GLI's approval of the Plans and Specs, MAB shall cause to be prepared and submitted to GLI for its review and approval or disapproval, which right of disapproval shall be absolute but not arbitrary, the following (the "Construction Documents"):

(a) The total guaranteed project budget (the "Budget") shall include all costs and expenses to be incurred by MAB in connection with the acquisition, development and exchange of the MAB Property, for the purpose intended therefor, up through and including when title is taken by GLI of the MAB Property.

(b) A "guaranteed cost" construction contract ("Construction Contract") in the latest AIA form executed by the General Contractor to be entered into with MAB, as owner, and providing for the construction of the Improvements at the price to be set forth in the Budget. This "guaranteed cost" shall not be subject to upward adjustment for any reason (except for variations or change orders described in Section 5.6) including unforeseen subsurface soil conditions, delays (except if caused by GLI) and cost of redoing defective work. The General Contractor must be acceptable to GLI. The Construction Contract expressly shall provide that all warranties running from the General Contractor to MAB, upon the acquisition of the MAB Property by GLI, shall run in favor of and inure to the benefit of GLI, GLI shall be fully subrogated to any rights of MAB under the Construction Documents.

(c) A performance and payment bond (the "Bond") in the customary statutory form for the District of Columbia and issued by a bonding company reasonably acceptable to GLI, which Bond shall guarantee the performance of and payment by the General Contractor under the Construction Contract.

(d) The following minimum insurance coverage evidenced by certificates of insurance issued by the respective insurance carriers and delivered to GLI, providing that not less than ten (10) days written notice shall be given to GLI prior to cancellation, termination, expiration, reduction or change of any such coverage:

(i) A Builders All Risk insurance policy in form and amount and reasonably acceptable to GLI, naming GLI to the extent that it has an insurable interest, MAB, the project manager, the Architect, and the General Contractor as insured and as the loss payees.

(ii) Comprehensive General Liability insurance with products liability, completed operations and contractual liability coverage covering the liability assumed by the General Contractor, subject to a minimum single limit of Five Million Dollars ($5,000,000) for bodily injury and property damage per any one occurrence with the certificate thereof specifically acknowledging the contractual liability under this Agreement (identified by date, location of

work and parties). This insurance policy must be endorsed to include GLI as an additional insured to the extent of its insurable interest and include a cross-liability endorsement. Before any earth moving or excavating equipment is used on the MAB Property, there shall be provided coverage in amounts not less than those stated in this sub-section for liability arising from excavating or drilling, for injury to, or destruction of, property below the surface of the ground. Before explosives are used on the MAB Property, there shall be provided coverage in amounts with limits not less than those specified in this subsection for all liability arising from blasting or explosion.

(iii) Automobile Public Liability (bodily injury) and Property Damage Liability Insurance, including coverage of vehicles hired or owned by the General Contractor, and vehicles owned by the General Contractor's employees and used in the General Contractor's business, (sometimes known as owned, non-owned, hired or leased motor vehicle coverage) subject to a minimum single liability limit of Five Million Dollars ($5,000,000) for bodily injury and property damage per any one occurrence. This insurance policy must be endorsed to include GLI as an additional insured to the extent of its insurable interest, and include a cross-liability endorsement.

(iv) Workers' Compensation Insurance fully insuring the General Contractor under the laws of the District of Columbia, covering all employees performing services in connection with the Construction Contract, for or on behalf of the General Contractor, and Employer's Liability Insurance covering liability for injuries, disease or death to any employee that, for whatsoever reason, are not covered by Workers' Compensation Laws, subject to a minimum limit of not less than One Hundred Thousand Dollars ($100,-000) (unless another minimum limit is specified by District law, in which event such minimum shall apply) for all damages arising out of bodily injury, disease, or death of employees in any one accident.

All the above required policies of insurance shall be written by an insurance company or companies authorized to do business in the District of Columbia.

(e) An architectural agreement ("Architectural Contract") in the latest AIA form executed by the Architect to be entered into with MAB as owner, and providing for the supervision of the construction of the Improvements for a fee included in the Budget. The Architect is acceptable to GLI.

If GLI fails to notify MAB of GLI's disapproval of the Construction Documents within thirty (30) days after GLI receives them, it shall be deemed to have approved them. If GLI notifies MAB of GLI's disapproval of any of the Construction Documents, MAB shall have sixty (60) days thereafter within which it shall cure GLI's objections to same. The Construction Documents shall not be changed by MAB after they have been approved by GLI except if required by governmental authority or to correct any error or omission and MAB promptly shall advise GLI of same.

5.4 As promptly as possible after the acquisition of the MAB Property in accordance with Section 2.1 and the compliance by MAB with those matters to be complied with by MAB as set forth in this Section 5, MAB shall obtain all building permits, variances, or similar authorizations and cause the construction of the Improvements to be commenced, diligently pursued, and completed in a good and workmanlike manner, on a "turn-key" basis, in accordance with Plans and Specs and with the terms of the Construction Contract. Construction of the Improvements shall be completed not later than eighteen (18) months after the building permit for the Improvements is issued.

5.5 If the construction is delayed due to circumstances beyond the control of MAB,

such as the usual occurrences described in the *force majeure* clause of the latest AIA construction contract (i.e. acts of God, strikes, riot, fire, flood, war, delay of carrier, material shortages, embargoes or inclement weather) and MAB promptly notifies GLI of the commencement and cessation of each such occurrence, then the date for the completion of construction shall be extended for the same period as the period of delay. If the construction is delayed due to a default by General Contractor under the Construction Contract and MAB is not party to such default, and MAB promptly notifies GLI of such default and acts or causes action to be taken to promptly complete the construction, then the date for the completion of construction shall be extended for a period reasonably sufficient to permit MAB to cause the construction to be completed. No cost or expense incurred by MAB in connection with the occurrence of any event referred to in this Section 5.5 shall be added to the Budget except MAB's reasonable, unavoidable additional cost or expense resulting from such occurrence, provided such cost or expense is not a "Hard" cost or expense but is a "Soft" cost or expense as those terms are used in the Budget.

5.6 All variations from Plans and Specs and all change orders to the Construction Contract shall be submitted by MAB to GLI in writing for GLI's prior approval. Such approval by GLI shall be deemed to have been given unless GLI shall notify MAB within twenty (20) days after GLI receives submission of such variation or change order that GLI disapproves such variation or change order. If the parties cannot promptly resolve the grounds for GLI's disapproval, MAB shall be deemed to have cured GLI's reason for such disapproval by promptly notifying GLI that such variation or change order shall be disregarded and its submission withdrawn. All increases and decreases in the cost of construction of the Improvements resulting from such variations or change orders approved by GLI shall be reflected in the cost of the Improvements on the MAB Property.

5.7 For the purposes of this Section, the Improvements shall be deemed completed upon the issuance by the District of Columbia of a Certificate of Occupancy, upon certification by the Architect that the Improvements substantially have been completed in accordance with the Plans and Specs, except for minor punch list items which shall be promptly completed, and upon GLI's written concurrence with the Architect's certification. Such written concurrence shall not be unreasonably withheld.

## 6.0 CONSTRUCTION LOANS

6.1 GLI acknowledges that MAB may finance the construction of the Improvements by obtaining loan(s) and securing same by Deed of Trust(s) for the benefit of such lender(s). However, the liens of any such loan(s) and Deed of Trust(s) shall be cancelled and satisfied of record at or prior to closing of the exchange of properties. GLI shall not assume the payment of any such indebtedness by MAB or accept title to the MAB Property subject to the liens of any Deed of Trust(s) given to secure any such indebtedness.

## 7.0 EXCHANGE PRICE

7.1 For purposes of this Agreement, the exchange price of the GLI Property shall be Twenty One Million Dollars ($21,000,-000) and the exchange price of the MAB Property shall be the sum of (i) the actual purchase price of Eight Million Three Hundred Ten Thousand Two Hundred Forty Dollars ($8,310,240) paid therefor by MAB in accordance with the Option, less the monies paid by GLI pursuant to Section 1. B. of the Option, and (ii) the actual direct costs and expenses paid by MAB in connection with the acquisition, development and exchange of the MAB Property, all in accordance with and subject to the restrictions contained in Section 5. MAB agrees to maintain accurate books and records sufficient to substantiate such costs and expenses. If the exchange price of the GLI Property is less than the exchange price of

the MAB Property, GLI shall pay the difference between the two exchange prices to MAB on the day of closing (the "Closing"). If the exchange price of the MAB Property is less than the exchange price of the GLI Property, MAB shall pay the difference between the two exchange prices to GLI on the Closing.

## 8.0 SURVEY

8.1 At least thirty (30) days prior to the Closing, MAB shall obtain a survey of the MAB Property, the cost to be included in the Budget, showing all the Improvements and certified by a District of Columbia Registered Land Surveyor (the "Survey"). The legal description prepared from the Survey shall form the basis for the legal description used in the conveyance of the MAB Property to GLI by MAB.

## 9.0 WARRANTIES

9.1 GLI hereby represents and warrants that it is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California, is qualified to do business in the District of Columbia, is not in violation of any provision of its Certificate of Incorporation, By-Laws or any other agreement, instrument or indenture, has power to enter into this Agreement and has duly authorized the execution and delivery of this Agreement by all necessary corporate action; the execution and delivery of this Agreement by GLI and the performance of its obligations hereunder do not require the approval, consent, authorization or waiver of any regulatory body or agency having jurisdiction over GLI; and neither this Agreement nor the agreements herein contained contravene or constitute a default under any agreement, instrument or indenture or any provision of its Certificate of Incorporation or By-Laws or any law or any rule or regulation of any governmental or regulatory body or agency to which it is subject.

9.2 MAB hereby represents and warrants that MAB is a resident of the District of Columbia, a natural born citizen of the United States of America, is not in violation of any material provision of any other agreement, instrument or indenture, has power to enter into this Agreement, has duly executed and delivered this Agreement, and the Personal Financial Statement as of October 10, 1979 of MAB which has been provided to GLI truly reflects or understates MAB's current financial position; the execution and delivery of this Agreement by MAB and the performance of MAB's obligations hereunder do not require the approval, consent, authorization or waiver of any regulatory body or agency having jurisdiction over MAB; and neither this Agreement nor other agreements herein contained contravene or constitute a default under any agreement, instrument or indenture or any law or any rule or regulation of any governmental or regulatory body or agency to which MAB is subject.

## 10.0 EXAMINATION OF TITLE AND DEFECTS IN TITLE

10.1 GLI states to MAB that GLI presently has marketable fee simple title to the GLI Property, subject only to those items set forth on the attached Schedule E. MAB shall have thirty (30) days from the date of this Agreement in which to cause to be examined GLI's title to the GLI Property and to notify GLI of any defects in such title that are found other than those referred to in Section 10.1. GLI shall have sixty (60) days after receipt of MAB's notice in which to cure any such defects.

## 11.0 CONVEYANCE OF THE GLI PROPERTY

11.1 At the closing, GLI will convey or cause to be conveyed to MAB by Special Warranty Deed, marketable title to the GLI Property in fee simple, which title, in addition to being marketable, will be free and clear of all liens (except any unpaid real property tax liens for the then current year, provided they are not delinquent), encumbrances, and restrictions of any kind and nature, except those stated in Schedule E, provided items 2, 3, 6 and 9 on Schedule E shall have been eliminated at GLI expense.

## 12.0 CONVEYANCE OF THE MAB PROPERTY

12.1 At the Closing, MAB will convey to GLI by Special Warranty Deed, marketable title to the MAB Property in fee simple, which title, in addition to being marketable, will be free and clear of all liens (except any unpaid real property tax liens for the then current year, provided they are not delinquent), encumbrances, and restrictions of any kind and nature except those stated in Schedule C.

## 13.0 CLOSING

13.1 The Closing will take place within thirty (30) days of the date of the completion of the Improvements to be erected on the MAB Property, at the offices of GLI in Washington, D.C., at such time and on such day as mutually shall be agreed to by MAB and GLI. At the closing (i) the parties will deliver all executed deeds and other documents necessary to consummate the exchange of the GLI Property and the MAB Property pursuant to the terms of this Agreement, (ii) each party will pay all real estate transfer taxes resulting from the conveyances of their respective Properties, (iii) GLI shall pay $60,000 of the recordation tax relative to GLI Property conveyance, and (iv) any difference in the exchange price of the MAB Property and the GLI Property shall be paid by the applicable party.

## 14.0 PRORATIONS

14.1 At the Closing of the transactions herein contemplated, all utilities, all District ad valorem taxes, and all other ad valorem taxes with respect to the GLI Property and the MAB Property shall be equitably prorated as of the date of the Closing. If the amount of such taxes is not known at the time of the Closing, proration of such taxes will be made upon the basis of the most recent ascertainable such tax.

## 15.0 REMOVAL

15.1 Prior to the Closing, GLI shall have the right to remove from the GLI Property all equipment and machinery, tools and movables, office furniture and fixtures, trade fixtures, mechanical and supply inventories, and any other property for which GLI, in its sole discretion, has a use. Any property which GLI does not remove shall become the property of MAB on the Closing. GLI shall not be obligated to restore or repair any damage caused by the removal of same.

## 16.0 THE GLI PROPERTY

16.1 MAB acknowledges that to the extent MAB desires MAB has had or will have had full opportunity to inspect or cause to be inspected the GLI Property and agrees to acquire it "as is"—"where is", it being understood that except as specifically set forth herein, GLI has made no warranties or representations pertaining to the GLI Property or the condition thereof.

For purposes of this exchange of properties, neither party shall bear any risk of loss to the improvements on the GLI Property from the date hereof until the Closing, provided GLI agrees to not commit waste to the land. If the improvements on the GLI Property are damaged or destroyed between the date hereof and the Closing, MAB shall have no right to terminate this Agreement by reason of such damage or destruction.

## 17.0 TERMINATION BY MAB

17.1 Any prior or subsequent provision of this Agreement to the contrary notwithstanding, and in addition to all other rights of MAB under this Agreement or provided by law (and not in lieu of any such rights), MAB, at MAB's sole election, may terminate this Agreement, by prompt notice to GLI and this Agreement shall be null and void, if any one or more of the following conditions or states of facts shall exist at the time of the Closing:

(a) Any notice shall be given or proceeding filed or commenced by any governmental authority having powers of condemnation, or other entity having powers of condemnation, concerning condemnation of all or such part of the GLI Property, which condemnation shall or

would, in the good faith opinion of MAB, render the GLI Property unsuitable for use as new office building site. If MAB elects to consummate the exchange notwithstanding such condemnation, then MAB shall be entitled to receive all proceeds and awards from such condemnation.

(b) GLI shall have failed to cure any valid objections to or defects in title in accordance with Section 10.

(c) The failure of any of GLI's warranties set forth in Section 9.1 to be true and correct on the Closing in the same manner and with the same effect as if then made, GLI hereby expressly agreeing that GLI will not cause any action to be taken or omitted between the date hereof and the Closing which would cause any of such representations to be untrue on the date of Closing.

(d) Failure of GLI to deliver to MAB at the Closing the instrument of conveyance described in Section 11, and if applicable any difference in the exchange prices.

(e) The District of Columbia shall have enacted a ordinance, rule or regulation which would, in the good faith opinion of MAB, render the GLI Property unsuitable for use as a new office building site.

If MAB does terminate this Agreement as aforesaid, MAB shall complete the Improvements on the MAB Property and shall have the right to receive from GLI the costs incurred by MAB to acquire, develop and complete the Improvements on the MAB Property. GLI shall promptly pay MAB the costs in cash.

### 18.0 TERMINATION BY GLI

18.1 Any prior or subsequent provision of this Agreement to the contrary notwithstanding, and in addition to all other rights of GLI under this Agreement or provided by law (and not in lieu of any such rights), GLI, at GLI's sole election, may terminate this Agreement, by prompt notice to MAB, and this Agreement shall be null and void, if any one or more of the following conditions or state of facts shall exist at the time of Closing:

(a) Any notice shall be given or proceeding filed or commenced by any governmental authority having powers of condemnation, or other entity having powers of condemnation, concerning condemnation of the MAB Property, or any portion of the MAB Property, which condemnation shall or would, in the good faith opinion of GLI, render the MAB Property unsuitable for use as a bus terminal. If GLI elects to consummate the exchange notwithstanding such condemnation, then GLI shall be entitled to receive all proceeds and awards from such condemnation.

(b) GLI shall have exercised any rights of disapproval as stated in this Agreement and MAB shall have failed or been unable to cure diligently and properly, the objection or reason giving rise to such disapproval.

(c) The failure of any of MAB's warranties set forth in Section 9.2 to be true and correct on the Closing in the same manner and with the same effect as if then made, MAB hereby expressly agreeing that MAB will not cause any action to be taken or omitted between the date hereof and the Closing which would cause any of such representations to be untrue on the date of Closing.

(d) The failure of MAB to acquire the MAB Property in accordance with Sections 2 and 3.

(e) Failure of MAB to complete the construction of the Improvements in the manner prescribed in Paragraph 5.

(f) Failure of MAB to deliver to GLI at the Closing the instrument of conveyance described in Section 12, and if applicable any difference in the exchange prices.

(g) Failure of MAB to deliver to GLI at the Closing an Owner's Affidavit stating that there are no pending suits, proceedings, judgments, bankruptcies, liens, (except current unpaid real property tax liens, provided they are not delinquent), or executions against or affecting the MAB Property in the District of Columbia which would affect the title to the

MAB Property; that there are no outstanding bills incurred for labor and materials used in making improvements or repairs to the MAB Property or for services of architects, surveyors, engineers or contractors incurred in connection therewith which have not been paid or otherwise provided for in a manner satisfactory to GLI; and that there are no outstanding security agreements, indebtedness, financing statements or title retention contracts concerning any Improvements on the MAB Property; except as set forth in the Affidavit.

If GLI does terminate the Agreement in accordance with Section 18.1(a) above, for a partial condemnation, MAB shall have the right to require GLI to pay, in cash, the cost incurred by MAB to acquire and develop the MAB Property, less MAB's receipt of any condemnation awards.

### 19.0 POSSESSION OF PROPERTY

19.1 GLI shall deliver possession of the GLI Property to MAB on the Closing and MAB shall deliver possession of the MAB Property to GLI on the Closing.

### 20.0 FEES

20.1 Except as otherwise specifically provided herein, the parties shall pay their own respective expenses, including attorney's fees, incident to the preparation and performance of this Agreement, whether or not the transactions contemplated herein are consummated, except those included in the Budget.

### 21.0 NO COMMISSION

21.1 No broker, agent or finder has been engaged by either MAB or GLI in regard to the transactions contemplated by this Agreement and no commission or brokerage fee is payable in regard hereto or as to the transactions contemplated hereby. However, it is acknowledged that with respect to the Option, MAB is paying a commission as part of the purchase price in regard thereto.

### 22.0 PRIOR DISCUSSIONS AND AMENDMENTS

22.1 This Agreement supersedes all prior discussions and agreements between GLI and MAB with respect to the exchange of the GLI Property and the MAB Property and all other matters contained herein and constitutes the sole and entire agreement between GLI and MAB with respect thereto. This Agreement may not be modified or amended unless such amendment is set forth in writing and signed by both GLI and MAB.

### 23.0 INTERPRETATION

23.1 The language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning, strictly neither for nor against either GLI or MAB, and without implying a presumption that the terms hereof shall be more strictly construed against one party by reason of the rule of construction that a document is to be construed more strictly against the person who himself or through his agent prepared the same, it being agreed that representatives of both parties have participated in the preparation hereof.

### 24.0 NOTICES

24.1 All acceptances, approvals, consents, requests, notices, demands or other writing in this Agreement provided to be given, made or sent by either party hereto to the other, shall be deemed to have been fully given, made or sent when made in writing and delivered in person or deposited in the United States mail, certified or registered, and postage prepaid, addressed, or delivered in person to:

GLI: President
 Greyhound Tower
 Phoenix, Arizona 85077

Copy Vice President–Real Estate
to: Greyhound Tower
 Phoenix, Arizona 85077

MAB: Mr. Morton A. Bender
 2202 Wyoming Ave. N.W.
 Washington, D.C. 20008

The address to which any such written communication may be given, made or sent

to either party may be changed by written notice given by such party as above provided.

## 25.0 SUCCESSORS AND ASSIGNS

25.1 This Agreement shall apply to and inure to the benefit of and be binding upon and enforceable against the parties hereto and their respective successors and assigns, to the same extent as if specified at length throughout this Agreement. Neither GLI nor MAB may assign their rights and obligations under this Agreement without the prior consent of the non-assigning party.

## 26.0 TIME OF THE ESSENCE

26.1 Time is of the essence of this Agreement.

## 27.0 GOVERNING LAW

27.1 This Agreement shall be governed by the laws of the District of Columbia.

## 28.0 MISCELLANEOUS

28.1 All attachments, exhibits and schedules referred to herein are hereby incorporated herein by reference and have been initialed for identification purposes by the parties hereto. The table of contents, headings and underscorings contained herein are for convenience purposes only and shall not be used to interpret or be deemed to extend or limit the specific Sections. The word or words initial capped and enclosed in quotation marks shall be construed as defined terms for purposes of this Agreement. The terms "GLI" and "MAB" shall be construed to mean, when required by the context, the directors, officers, employees, invitees, contractors, materialmen, servants and agents of such GLI or MAB.

28.2 This Agreement does not create the relationship of principal and agent or a partnership or joint venture, or of any other association other than that of parties to a mutual exchange of real properties.

28.3 The acknowledgments, conditions, representations, warranties, disclaimers, and any agreements herein shall specifically survive the Closing.

## 29.0 COUNTERPARTS

29.1 This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, MAB has executed, and GLI has caused these presents to be executed and its corporate seal to be hereunto affixed by GLI's duly authorized officers, as of the day and year first above written.

GREYHOUND LINES, INC.
(Corporate Seal)
By: /s/F.L. Nageotte
 Chairman of the Board
Attest: /s/Carol Kotek
 Assistant Secretary
MORTON A. BENDER
/s/Morton A. Bender

## SCHEDULE "A"

*Legal Description*

Lot 30 in the Combination of lots and alley closed in Square 318 made by Greyhound Lines, Inc., as per plat recorded in Liber 163 at folio 176 of the Records of the Office of the Surveyor of the District of Columbia.

## SCHEDULE "B"

## OPTION TO PURCHASE
## REAL ESTATE

THIS AGREEMENT, made as of the 17th day of February, 1981, between WILLIAM P. HALLMAN, Trustee ("Seller") and GREYHOUND LINES, INC. ("Buyer")

WITNESSETH:

WHEREAS, Seller is seized and possessed of that certain real estate being in the District of Columbia known as Lot 432 in Square 674, bearing a street address of 90 K Street, N.E., including (except as otherwise hereinafter provided) all gas, oil and other minerals contained beneath the sur-

face thereof and all buildings and improvements now located thereon (the "Property") and

WHEREAS; Seller desires to sell to Buyer and Buyer wishes to obtain an option to purchase the Property at the price and subject to the terms and conditions herein contained.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, Seller hereby grants and gives to Buyer the exclusive right and option to elect to purchase the Property for a period expiring within four (4) months from the date hereof, time being of the essence, at and for the price of Eight Million Three Hundred Ten Thousand Two Hundred Forty Dollars ($8,310,240.00), payable at the time and in the manner hereinafter provided.

The parties further agree that:

1. EXERCISE OF OPTION:

A. In order to exercise this option, Buyer shall deliver or mail written notice of such election to Seller within the time set forth below. Any such notice by mail shall be sent by registered or certified mail, postpaid, addressed to Seller at the address shown in Paragraph 13, and the date of such notice shall be the date of postmark of the same by a United States Post Office. Buyer may not exercise the option to purchase prior to May 28, 1981. Any attempted exercise or notice of exercise of said option prior to such date shall be void and of no effect.

B. Buyer, by written notice given to Seller on or before March 17th, 1981, shall have the right to terminate this Agreement, and neither party shall have any further rights or liabilities hereunder. If Buyer has not then, by written notice to Seller, terminated this Agreement, on or before the 17th day of the first, second and third months immediately succeeding the date hereof, respectively, Buyer shall pay to Seller the separate sum of Twelve Thousand Five Hundred Dollars ($12,500.00) as the consideration for such monthly's portion of the option period which sum shall be

nonrefundable and shall be retained by Seller as his property. If Buyer shall fail to pay any such separate sum timely, Buyer shall be deemed to have terminated this Agreement as of the due date of such sum, Seller shall have the right to retain all previous sums paid to him by Buyer, and this Agreement shall terminate, whereupon neither party shall have any further rights or liabilities hereunder.

C. In the event that Buyer exercises its option to purchase by giving Seller written notice thereof prior to the expiration of this Agreement, settlement shall be held within thirty (30) days thereafter, upon not less than five (5) days written notice to Seller. Settlement shall be held at the offices of the title insurance company, described in Paragraph 5(b), in Metropolitan Washington, D.C. In the event that, notwithstanding the exercise of the option, Buyer fails to timely make settlement, Seller may retain all sums previously paid to Seller, as consideration for the option granted hereby and not liquidated damages for breach of its then binding contract to purchase the Property. The binding contract to purchase the Property created by Buyer's exercise of the option shall be specifically enforceable against Buyer in the event Buyer fails to timely make settlement (though required to do so by the terms of this Agreement) and as a cumulative remedy to all other remedies afforded by law. Buyer shall be liable for all damages and reasonable attorneys' fees resulting from Buyer's breach, specifically including interest on the purchase price from the required settlement date until the date the full purchase price is received by Seller, interest to be computed at the Prime Rate being charged from time to time during such period by Citibank, N.A. of New York City.

2. CONTRACT. If Buyer exercises the option within the time and in the manner hereinabove set forth, this Agreement shall become a binding contract for purchase and sale, subject to the terms and conditions herein contained.

3. ACCESS. During the period this option remains in effect, Seller agrees that

Buyer, and all persons designated or authorized by Buyer, shall have free and unrestricted access to the Property at all reasonable times for the purpose of examining, exploring, inspecting, prospective, boring testing and surveying the Property and for all other purposes deemed necessary or advisable by Buyer. Buyer recognizes that the Property is currently leased, on a month to month basis, by Colonial Parking, Inc., for use as a parking lot and Buyer agrees not to unreasonably interfere with such use of the Property by said lessee. Buyer agrees to indemnify Seller and save him harmless from any liability to persons or property resulting from Buyer's entry upon the Property or any activities performed by or on behalf of Buyer on the Property.

4. NO SALE OR ENCUMBRANCE. During the period this option remains in effect and if exercised until the purchase and sale is closed, Seller agrees not to convey or encumber the Property or any part thereof in any manner whatsoever, and not to commit waste or any other action which adversely affects the values of the Property. Nothing herein may be construed to prohibit Seller from executing a contract for sale of the Property which is contingent upon the Buyer's rights under this Agreement.

5. CONTRACT FOR PURCHASE AND SALE. If Buyer exercises this option within the time and in the manner hereinabove provided:

(a) *Survey:* Buyer shall have the option to cause a survey to be made of the Property, at its cost and expense, by a registered land surveyor. In the event that any such survey reveals that the square footage of the Property is, in the aggregate, more than or less than 10% of 103,878 square feet, the purchase price shall be adjusted accordingly on the basis of Eighty Dollars ($80.00) per square foot.

(b) *Title:* Buyer, at its expense, shall obtain, within thirty (30) days from the date hereof, a Title Commitment for an owner's title insurance policy regarding the Property, issued by a national title insurance company acceptable to Buyer in the amount of the full purchase price showing title in Seller to be marketable, insurable and perfect of record, subject only to (i) matters permitted by Paragraph 5(d) hereof, and (ii) the usual General Exceptions contained in owner's title insurance policies issued by the title company.

(c) *Quality of Title:* If the Title Commitment discloses any defect in title (other than those objections above mentioned) Buyer shall notify Seller of same within thirty (30) days from the date hereof. Seller then shall have thirty (30) days from the date of such notice within which to cure such defects. If such defects in title be not cured within thirty (30) days, Buyer shall have the right, within ten (10) days after such objection remains uncured, to terminate this Agreement or, at Buyer's election, to accept the title as it then is giving to Seller notice of such election. If Buyer elects to accept title the transaction shall close in accordance with Paragraph 5(d) hereof, and Buyer shall receive a credit to the purchase price of the amount required to cure any defects in title which may be remedied by payment of an ascertainable sum, but in no event shall the credit exceed $10,000.00. Upon failure by Buyer to give notice of such election within the ten (10) day period specified above, this Agreement thereupon shall, without further action by Seller or Buyer, become null and void. If Buyer does not, in the first instance, notify the Seller of the existence of any title defects within thirty (30) days from the date hereof, Buyer shall accept title in the state of existence on the date of issuance of the said title commitment. If Seller is unable to convey title of the quality required by this Agreement, the sole obligation of Seller shall be to refund all the consideration paid by Buyer for this option, and neither Seller nor Buyer shall have any further claim against the other by reason of this Agreement and the lien, if any, of Buyer against the Property shall wholly cease.

The acceptance of the deed by Buyer shall be deemed to be a full performance and discharge of every agreement and obligation to be performed by Seller pursuant to the provisions of this Agreement. However, the acknowledgements, indemnifications, representations, warranties, disclaimers, and any agreements which contemplate performance by Seller after such acceptance shall specifically survive.

(d) *Closing:* At closing, Seller shall deliver to Buyer:

(i) A special Warranty Deed conveying to Buyer title to the Property, subject only to:

(a) general real estate taxes for the fiscal year ending June 30, 1981, if unpaid, and all year(s) subsequent thereto.

(b) exceptions or defects in title permitted by this Agreement or otherwise waived pursuant to the terms hereof.

(ii) An Owner's Affidavit stating that there are no outstanding indebtedness for equipment, appliances or other fixtures attached to the Property, that there are no disputes concerning the location of the lines and corners of the Property, that there are no pending suits, proceedings, judgments, bankruptcies, liens or executions against or affecting the Seller in the jurisdiction in which the Property is located which would affect the title to the Property; that there are no outstanding bills incurred for labor and materials used in making improvements or repairs on the Property or for services of architects, surveyors or engineers incurred in connection therewith which have not been paid or otherwise provided for in a manner satisfactory to Buyer; and that there are no outstanding indebtednesses, security agreements, financing statements or title retention contracts concerning any improvements on personal property located upon the Property.

(e) *Buyer's Final Payment:* At closing, Buyer shall deliver a cashiers check to Seller in the amount of the full purchase price of the Property less a credit for the consideration paid by Buyer for this option, and less any other credits and adjustments due Buyer.

(f) *Possession:* Possession of the Property shall be delivered to Buyer by Seller upon the closing of the transaction contemplated hereby.

(g) *Taxes:* All real estate taxes and assessments of any nature which have become a lien upon the Property as of the date of closing shall be paid by Seller. Current real estate taxes, if any, shall be prorated and adjusted as of the date of closing. If the amount of such taxes is not then ascertainable, the proration shall be made on the basis of the amount of the most recently ascertainable taxes, and the parties shall re-prorate and adjust the amount of such taxes upon receipt of the bill for current taxes. All recording fees arising from the recordation of documents necessary to show good title to the Property in Seller shall be paid by Seller or credited to Buyer against the full purchase price. Seller and Buyer shall each pay, in equal shares, all D.C. Recordation Tax, Grantor's Tax, transfer or stamp taxes, or other fees imposed on the transfer of the Property by the District of Columbia, or imposed on the recording of documents of transfer. All other settlement charges shall be paid solely by Buyer.

(h) *Brokerage:* Seller agrees to save and hold Buyer harmless from any and all claims for brokerage fees arising out of this purchase and sale of the Property. Seller represents that Coldwell Banker Commercial Brokerage Company has acted as broker in this transaction, and Seller agrees to compensate the broker pursuant to the terms of a separate agreement. Buyer warrants that it has not acted with any broker in this transaction other than Coldwell Banker Commercial Brokerage Company, and Buyer agrees to save and hold Seller harmless from any damages, plus reasonable attorneys fees, resulting from a breach of such warranty.

6. ZONING: Seller warrants that the Property is currently zoned CM–3, that Seller will take no action to change such zoning classification prior to the date of settlement, and that the continued designation of the Property as being in such zoning category on the date of settlement shall be a condition precedent to Buyer's obligation to make settlement.

7. REZONING: Seller agrees that if any governmental or regulatory agency initiates a rezoning of the Property prior to date of closing, Buyer shall have the right to terminate this Agreement upon written notice to Seller, both parties shall be relieved of any further liability hereunder, and Seller shall immediately return to Buyer all the consideration paid for this option. Seller further warrants that Seller is not aware nor has received any notification of any proposed condemnation or rezoning of the Property.

8. IMPROVEMENTS: Buyer shall accept all buildings, structures, and improvements on the Property in "as is" condition.

Seller warrants and covenants that Seller has not received nor is aware of any notification from the Department of Building and Safety, Health Department, Environmental Protection Agency, or such other City, County, State or Federal authority having jurisdiction, requiring any work to be done on the Property, nor is Seller aware of any violation of any regulation or law of the aforesaid governmental agencies having jurisdiction affecting the Property. If Seller receives such notice prior to date of closing, Seller will promptly notify Buyer with a copy thereof. However, the existence of any such notice or violation shall not affect Buyer's liability hereunder, ex-cept that Buyer may elect to terminate this Agreement if the closing has not yet oc-curred, and received all the consideration paid for this option, and Seller shall have no obligation to Buyer to remedy such vio-lation.**

** Should such notice or violation concern the land comprising the Property, Seller may (1–: shall have no obligation to) cure such violation prior to the date of closing, in which case Buyer's liability hereunder shall not be affected. If

9. RISK OF LOSS:

A. The risk of loss of all improvements prior to the date of closing shall be on Seller; provided, however, no damage or destruction of any improvements on the Property shall affect Buyer's liability hereunder, nor shall the same operate in any manner to reduce the purchase price for the Property.

B. In the event that the Property is taken as a result of any exercise of the power of eminent domain prior to the date of closing, Buyer, at its option, shall have the right to:

(a) terminate this Agreement and its obligation to purchase the Property in which event Seller shall immediately return to Buyer the consideration paid for this option and any undisbursed portion of the Deposit, or

(b) waive the foregoing right and enforce its remaining right to purchase the Property as provided herein at the full purchase price, provided that in such event Buyer shall receive the benefit of any condemnation award paid or to be paid for such taking.

10. At Buyer's election, made not later than fifteen (15) days prior to settlement, in lieu of paying the entire purchase price by cashiers check at the time of settlement, the purchase price for the Property may be defrayed by paying one-third thereof by cashiers check at the time of settlement, and with the remainder to be evidenced by Buyer's promissory note payable in quarter annual installments of interest on the outstanding balance thereof at the Prime Rate being charged from time to time by Citibank, N.A., and with a principal installment equal to one-third of the purchase price being due eighteen (18) months following the date of settlement, said note to be payable in full three (3) years from the date of settlement. The note shall permit pre-

such violation is not cured prior to the date of Closing, Buyer may elect to terminate this Agreement and receive repayment of all consideration paid for this Option.

payment at any time, without penalty. The note shall be secured by a Deed of Trust upon the Property, the trustees therein to be named by Buyer-Seller. The note and deed of trust shall be in form reasonably satisfactory to Seller's counsel and shall include the provision that the trustees are required, without further consent of the note holder, to subordinate the lien thereof to a first Deed of Trust given as security for a loan the proceeds of which are employed solely to construct improvements upon the Property.

11. At all times prior to Buyer's exercise of the option to purchase the Property, Buyer shall diligently pursue such studies and investigations as it deems advisable to determine the suitability of the Property for use by Buyer as a Greyhound bus depot. Further, during such period, Buyer shall not engage in negotiations with the owner, or owner's agent, of any other property in the District of Columbia which Buyer would consider employing for erection of a Greyhound bus depot. In the event that Buyer violates such prohibition, the Seller may, at its option, terminate this Agreement, whereupon the Deposit shall be forfeited to the Seller as liquidated damages and neither party shall have any further rights or liabilities hereunder.

12. Buyer may assign its rights under this Agreement, provided, however, that no such assignment shall relieve Buyer from the obligation to execute, as co-maker with the actual purchaser of the Property, the note and Deed of Trust contemplated by Section 10 hereof.

13. MISCELLANEOUS:

(a) If either party fails to comply with any terms or condition of this Agreement, the other party without waiving any legal or equitable remedy such other party may have by reason of such breach, may declare this Agree-ment null and void by written notice to the defaulting party. In the event of a breach by Seller, Buyer shall be entitled to return of the consideration paid by Buyer to Seller for this option.

(b) The parties agree that all understandings and agreements heretofore had between them and merged in this Agreement, which alone fully and completely expresses their agreement, and that the same is entered into after full investigation, neither party relying upon any statement of representation not embodied in this Agreement.

(c) This Agreement may not be changed or terminated orally and shall apply to and bind the heirs, executors, administrators, successors and assigns of the respective parties. As used herein, the term "Buyer" shall include any assignee of Buyer, subject to the provisions of Section 12 hereof.

(d) The various headings used in this Agreement are for convenience only and are not to be used interpreting the text of the section in which they appear or to which they relate.

(e) This Agreement shall be governed and construed in accordance with the laws of the District of Columbia.

14. NOTICES: All notices, demands, acceptances, or other communication required or permitted by this Agreement shall be deemed to be fully given when delivered in person, or mailed, certified or registered, postage prepaid, addressed to:

SELLER: William P. Hallman
3002 Fort Worth National Bank Building
Fort Worth, Texas

copies to: Stewart S. Greenebaum
1301 York Road
Lutherville, Maryland

and

Sheldon B. Kamins, Esquire
Suite 400
1775 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

BUYER: The Greyhound Corporation
Real Estate Department
Greyhound Tower
Phoenix, Arizona 85077

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SELLER:

William P. Hallman, J., Trustee

William P. Hallman, Trustee

BUYER:

GREYHOUND LINES, INC.

By: E.E. Shew

EXECUTIVE VICE PRESI-DENT

S C H E D U L E " C "

REVISED

COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY

CASE NUMBER 214660

SCHEDULE A

1. Effective date: February 5, 1981

2. Policy or Policies to be issued: Amount

(a) X ALTA Owner's Policy Form B-1970 (Amended 10-17-70) $8,300,000.00

Proposed Insured: name to be designated

(b) ___ ALTA Loan Policy (Amended 10-17-70) $_____

Proposed Insured:

3. The estate or interest in the land described or referred to in this Commitment and covered herein is

is a fee simple title _____ and title to said estate, or interest is at the effective date
(Identify estate covered, i.e. Fee, Leasehold, etc.)

hereof vested in: William P. Hallman

4. The land referred to in this Commitment is described, as follows:

Lot 432 in Square 674 in the District of Columbia Redevelopment Land Agency's combination of lots, part of Fenton Place closed, and parts of public alleys closed, as per plat recorded in Liber 146 at folio 82 of the Records of the Office of the Surveyor of the District of Columbia.

Countersigned:

Authorized Signatory—Leonard W. Harrington, Jr., Vice President and Title Officer

### COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY

**SCHEDULE B I**
(Requirements)

case no. 214660

1. The following are the requirements to be complied with:

 1. Payment to, or for the account of, the sellers or mortgagors of the full consideration for the estate or interest to be insured.

 2. Instruments in insurable form which must be executed, delivered and duly filed for record:

 a) Deed in proper form from William P. Hallman, with spouse uniting if married, vesting fee simple title in a purchaser to be designated.

3. Payment of all taxes and water rent through the date of settlement.

4. The Articles of incorporation, by-laws, and proof of corporate good standing of the purchaser to be designated must be furnished to this company if said purchaser is a corporation. If the said purchaser is a limited partnership, then its certificate of limited partnership will have to be furnished.

5. Satisfactory disposition of all liens, judgments and adjudications which may be found against the proposed purchaser to be designated.

COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY

SCHEDULE B II
(Exceptions)

case no. 214660

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. All assessments and taxes for the __2nd ½ fiscal__ year 19__81__ and all subsequent years.

3. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

4. Any encroachments, easements, measurements, variations in area or content, party walls or other facts which a correct survey of the premises would show. ☐ Eliminated.

5. Rights or claims of parties in possession not shown by the public records.

6. Roads, ways, streams or easements, if any, not shown by the public records, riparian rights and the title to any filled-in lands.

7. Covenant running with the land contained in Section 2.3 (a)(v) of Contract of Sale by and between the District of Columbia Redevelopment Land Agency and Chrysler Motors Corporation dated October 12, 1964 and recorded October 30, 1964 as instrument no. 37866 in Liber 12306 at folio 578 among the Land Records of the District of Columbia, as amended by First Amendment to Contract of Sale dated June 15, 1965 and recorded June 18, 1965 as instrument no. 20738 in Liber 12429 at folio 362 among the aforesaid Land Records, as follows:
 Section 2.3(a)(v) Nondiscrimination.- The purchaser agrees for itself, and any successor in interest, not to effect or execute any agreement, lease, conveyance or other instrument whereby the property or any part thereof is restricted upon the basis of race, creed, color, or national origin in the sale, lease, or occupancy thereof; nor discriminate upon the basis of race, creed, color or national origin in the use or occupancy of the property or any improvements erected or to be erected thereon, or any part thereof.

8. Covenant contained in the Fifth clause of Deed from the District of Columbia Redevelopment Land Agency to Chrysler Motors Corporation dated June 15, 1965 and recorded June 18, 1965 as instrument no. 20739 in Liber 12429 at folio 369 among the Land Records of the District of Columbia, as follows:
 FIFTH. The party of the second part agrees for itself or any successor in interest, not to discriminate upon the basis of race, creed, color or national origin in the sale, lease, use or occupancy of the property hereby conveyed or any part thereof or any improvements erected or to be erected thereon or any part thereof.

COMMITMENT FOR TITLE INSURANCE

*Issued by*

## COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY
Washington, D.C.

### A STOCK COMPANY

Columbia Real Estate Title Insurance Company, a District of Columbia corporation, herein called the company, for a valuable consideration, hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed Insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges therefor; all subject to the provisions of Schedules A and B and to the Conditions and Stipulations hereof.

This Commitment shall be effective only when the identity of the proposed Insured and the amount of the policy or policies committed for have been inserted in Schedule A hereof by the Company, either at the time of the issuance of this Commitment or by subsequent endorsement.

This Commitment is preliminary to the issuance of such policy or policies of title insurance and all liability and obligations hereunder shall cease and terminate 120 days after the effective date hereof or when the policy or policies committed for shall be issued, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the company.

IN WITNESS WHEREOF, the said Company has caused its Corporate Name and Seal to be hereunto affixed; this instrument, including Commitment, Conditions and Stipulations attached, to become valid when countersigned by an Authorized Officer or Agent of the Company.

COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY

*Executive Vice President and Manager*

ATTEST:

*Secretary*

### CONDITIONS AND STIPULATIONS

1. The term mortgage, when used herein, shall include deed of trust, trust deed, or other security instrument.

2. If the proposed Insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations.

3. Liability of the Company under this Commitment shall be only to the named proposed Insured and such parties included under the definition of Insured in the form of policy or policies committed for and only for actual loss incurred in reliance hereon in undertaking in good faith (a) to comply with the requirements hereof, or (b) to eliminate exceptions shown in Schedule B, or (c) to acquire or create the estate or interest or mortgage thereon covered by this Commitment. In no event shall such liability exceed the amount stated in Schedule A for the policy or policies committed for and such liability is subject to the insuring provisions, the Conditions and Stipulations, and the Exclusions from Coverage of the form of policy or policies committed for in favor of the proposed Insured which are hereby incorporated by reference and are made a part of this Commitment except as expressly modified herein.

4. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by this Commitment must be based on and are subject to the provisions of this Commitment.

An American Title Insurance Company

## ORDER

Upon consideration of defendants' objections to deposition testimony and trial exhibits and motion to strike portions of plaintiff's post-trial brief, plaintiff's opposition to said objections, defendants' reply, and the entire record herein, it is by the Court this 31st day of July 1984,

ORDERED that the deposition testimony of Margaret Hoffman shall not be con-

sidered by the Court because Ms. Hoffman was never mentioned at trial and defendants never agreed to the admission of said testimony; it is further

ORDERED that the Court shall allow the introduction into evidence of all exhibits cited by plaintiff and afford them appropriate weight; and it is further

ORDERED that defendants' motion to strike portions of plaintiff's post-trial brief shall be denied as moot.